STATE of Wisconsin EX REL. Patricia A. WATTS and Gertrude Huerlimann, individually and as representatives of the class of persons similarly situated, Petitioners-Appellants,

v.

The COMBINED COMMUNITY SERVICES BOARD OF MILWAUKEE COUNTY, Gerald Engel, John A. Heidenreich, Kathleen Blonski, Thomas Korb, and Anne Tobias, individually and as members of the Combined Community Services Board of Milwaukee County, Symuel Smith, individually and as program director of the Combined Community Services Board of Milwaukee County, Richard Gerhardstein, M.D., individually and as medical director of the Milwaukee County Mental Health Complex, and as acting clinical program director of the Combined Community Services Board of Milwaukee County, Donald Percy, individually and as Secretary of the Wisconsin Department of Health & Social Services, and Wisconsin Department of Health & Social Services, Respondents.†

IN the MATTER OF Julius ERDMANN:
Julius ERDMANN, Appellant,

v.

COMBINED COMMUNITY SERVICES BOARD OF MILWAUKEE COUNTY, Respondent.†

Supreme Court

No. 84–1107. Argued November 26, 1984.— Decided January 31, 1985.

(Also reported in 362 N.W.2d 104.)

† Motion for reconsideration denied April 30, 1985, without costs.

For the petitioners-appellants there were briefs by *Thomas K. Zander, Legal Aid Society of Milwaukee, Inc.,* and *Robert W. Pledl,* assistant state public defender, of counsel, all of Milwaukee, and oral argument by *Mr. Zander.*

For the respondents there was a brief and oral argument by *Robert A. McKnight,* principal assistant corporation counsel.

Amicus curiae brief was filed by *Dianne Greenley,* Madison, for the Wisconsin Coalition for Advocacy, Inc. and Mental Health Association in Wisconsin, Inc.

STEINMETZ, J.  The issues in this case are:

(1)  Whether chs. 55 and 880, Stats., deny protectively placed individuals due process and equal protection of law by failing to require periodic automatic court review of the individual's need for guardianship and protective placement.

(2)  Whether the temporary emergency diagnostic and treatment powers granted under sec. 55.06(9)(d) and 55.06(9)(e), Stats.,[1] satisfy the requirements of equal protection.

---

[1] Sec. 55.06(9)(d) and (e), Stats., provides:

"(d) Transfer of placement may be made by a guardian to a facility providing acute psychiatric treatment for the purpose of psychiatric diagnostic procedures for a period not to exceed 10 days. A court may order such placement following petition by the placement facility or other interested person, and a hearing in the manner provided in par. (b). Such period may not be extended for the purpose of providing psychiatric treatment except in the manner provided in par. (e).

"(e) Temporary transfer of placement may be made for emergency acute psychiatric inpatient treatment with prior notice to the guardian when feasible. If it is not feasible to notify the guardian in advance, written notice shall be provided immediately upon transfer, and the court or appropriate board under s. 55.02 or an agency designated by it shall be notified within 48 hours. Upon petition by a guardian, ward or attorney,

(3) Whether a guardian has the statutory authority to consent to mental hospitalization of his or her ward who is not protectively placed and who has not consented to such hospitalization.

Patricia Watts and Gertrude Huerlimann are adult women who were adjudged incompetent and ordered protectively placed pursuant to secs. 880.33(1) and 55.06(1), Stats.,[2] by the Milwaukee county circuit court in 1977 and 1978, respectively. Both women were initially confined in the Milwaukee County Mental Health Complex. Both were transferred to home placements in the community within one year of being institutionalized, and both continue to reside in community placements. Following petitioner Watts' placement in 1977, she was involuntarily hospitalized in an acute psychiatric unit pursuant to sec. 55.06(9)(e) at least seven times for periods ranging from seven to forty days in

___

or other interested person specifying objections to a transfer, the court shall order a hearing as provided in par. (b). Such treatment period may not exceed 15 days, including any transfer under par. (d). Any application for continued psychiatric inpatient treatment requires proceedings under s. 51.20 or 51.45 (13)."

[2] "Sec. 55.06 Protective placement. (1) A protective placement under this section is a placement of a ward for the primary purpose of providing care and custody. To be eligible for placement, an individual shall have attained the age of 18, but an individual who is alleged to be developmentally disabled may receive placement upon attaining the age of 14. No protective placement under this section may be ordered unless there is a determination of incompetency in accordance with ch. 880, . . . ."

Sec. 880.33(1), Stats., provides:

"880.33 Incompetency; appointment of guardian. . . .

"(1) Whenever it is proposed to appoint a guardian on the ground of incompetency, a licensed physician or licensed psychologist, or both, shall furnish a written statement concerning the mental condition of the proposed ward, based upon examination. A copy of such statement shall be provided to the proposed ward, guardian ad litem and attorney."

length. The original guardianship and protective placement orders for both petitioners have not been modified or terminated.

On October 17, 1980, Watts and Huerlimann petitioned the trial court, the Honorable John E. McCormick, for a writ of habeas corpus and for a declaratory judgment alleging four separate causes of action. The trial court held a hearing on petitioner Watts' claim that she was being illegally confined in an acute psychiatric ward of the Milwaukee County Mental Health Complex. The court sustained that claim, ordered her release, and set a date for a hearing on the remaining causes of action.

By the time the parties appeared before the trial court on October 1, 1982, only two of the original four causes of action remained in dispute. On these issues, the same issues now before this court, the trial court denied the plaintiffs' petition entering judgment against them on May 7, 1984.

Julius Erdmann's court appointed guardian ad litem had filed with the circuit court a petition for review and for declaratory judgment. The petition was brought as a class action on behalf of Mr. Erdmann and all persons who are or who may be in the future admitted to psychiatric units without their consent, but with the consent of their court appointed guardians, where there is no existing protective placement order issued under sec. 55.06(9)(a) or 55.06(11)(c), Stats.[3] The petition

[3] Sec. 55.06(9)(a), Stats., provides:

"(9)(a) The court may order protective services under s. 55.05 (2)(d) as an alternative to placement. When ordering placement, the court, on the basis of the evaluation and other relevant evidence shall order placement through the appropriate board designated under s. 55.02 or an agency designated by it. Placement shall be made in the least restrictive environment consistent with the needs of the person to be placed. Factors to be considered in making protective placement shall include the

sought a declaratory judgment holding that guardians do not have the legal authority to consent to admissions of their wards to psychiatric units without the consent of the ward or without a protective placement order that would authorize a temporary hospitalization under sec. 55.06(9)(d) or 55.06(9)(e).

Since the *Watts* case was pending in the Milwaukee circuit court at the time of the filing of the *Erdmann* case, and since the *Watts* case raised the issue of the constitutionality of secs. 55.06(9)(d) and 55.06(9)(e), Stats., the two cases were consolidated. The petition for declaratory judgment was denied in the *Erdmann* case also by the Honorable John E. McCormick on May 7, 1984. The petitioners petitioned this court to bypass the court of appeals and bypass was granted.

■ The defendants argue the case is moot since the petitioners are not presently being involuntarily detained in any mental health center. However, Watts and Huerli-

---

needs of the person to be protected for health, social or rehabilitative services and the level of supervision needed. Placement under this section does not replace commitment of a person in need of acute psychiatric treatment under s. 51.20 or 51.45(13). Placement may be made to such facilities as nursing homes, public medical institutions, centers for the developmentally disabled, foster care services and other home placements, or to other appropriate facilities but may not be made to units for the acutely mentally ill. The prohibition of placements in units for the acutely mentally ill does not prevent placement by a court for short-term diagnostic procedures under par. (d). Placement in a locked unit shall require a specific finding of the court as to the need for such action. A placement facility may transfer a patient from a locked unit to a less restrictive environment without court approval."

Sec. 55.06(11)(c), Stats., provides:

"(c) Upon a finding of probable cause under par. (b), the court may order temporary placement up to 30 days pending the hearing for a permanent placement, or the court may order such protective services as may be required."

mann are still under protective placement orders which subject them to possible confinement under the involuntary hospitalization provisions of secs. 55.06(9)(d) and 55.06(9)(e), Stats., being challenged in this case, and they are denied court reexaminations of their need for continued protective placement, and lastly, both the *Watts* case and *Erdmann* case are class actions seeking declaratory judgments. The issues are of great public concern with regular recurrence and due to the limited period of confinement of ten days and fifteen days respectively under sec. 55.06(9)(d) and (e), a limited opportunity exists to bring the issues before the courts. By the time the issues are scheduled before trial courts, the petitioners similarly situated are likely no longer to be detained for diagnosis or treatment. The case is within the exception to the rule that this court does not consider moot issues as stated *In Matter of G.S.*, 118 Wis. 2d 803, 805, 348 N.W.2d 181 (1984):

"This court has consistently adhered to the rule that a case is moot when a determination is sought upon some matter which, when rendered, cannot have any practical legal effect upon a then existing controversy. . . . It is generally thought to be in the interest of judicial economy to avoid litigating issues that will not affect real parties to an existing controversy. . . . However, this court has carved out certain exceptions to this general rule where: the issues are of great public importance; the constitutionality of a statute is involved; the precise situation under consideration arises so frequently that a definitive decision is essential to guide the trial courts; the issue is likely to arise again and should be resolved by the court to avoid uncertainty; or, a question is capable and likely of repetition and yet evades review because the appellate process usually cannot be completed and frequently cannot even be undertaken within a time that would result in a practical effect upon the parties."

Petitioners' first claim is that ch. 55, Stats., is unconstitutional insofar as it allows protective placements

to be indefinite in duration without requiring automatic, periodic reexamination of the need for continued protective placement. We hold ch. 55 unconstitutionally deprives individuals of an automatic periodic reexamination of the need for continued protective placement.

Wisconsin law regarding the institutionalization of the mentally disabled underwent radical change with the landmark federal district court decision in *Lessard v. Schmidt*, 349 F. Supp. 1078 (E.D. Wis. 1972) ; *vacated and remanded on procedural grounds*, 414 U.S. 473 (1974) ; *judgment reentered*, 379 F. Supp. 1376 (1974) ; *vacated and remanded on procedural grounds*, 421 U.S. 957 (1975) ; *judgment reentered*, 413 F. Supp, 1318 (1976), in which Wisconsin's involuntary civil commitment law was held unconstitutional. In response to *Lessard*, the legislature enacted three new civil commitment laws; one for persons who are acutely mentally ill, developmentally disabled, or drug dependent (ch. 430, Laws of 1975, creating secs. 51.15–51.20, Stats.) ; another law for alcoholics (ch. 198, Laws of 1973, creating sec. 51.45(12) and (13), Stats.) ; and another law for persons having permanent mental disabilities (ch. 284, Laws of 1973, creating sec. 55.06, Stats.). All three of these laws authorize court ordered institutionalization of mentally disabled individuals for the purpose of care and custody.

There are similarities in purpose and protection afforded by ch. 51 and ch. 55, Stats. Both ch. 51, civil commitment, and ch. 55, protective placement, deal with persons who are mentally ill, developmentally disabled, chronic alcoholics or drug abusers. Secs 51.20(1)(a)1, 51.45(13) and 55.06(2)(c). Both require a finding of dangerousness before involuntary commitment or placement can be imposed. Secs. 51.20(1)(a)2, 51.45(13) (a)2, 55.06(2)(c).[4] Both require treatment in the least

---

[4] Sec. 51.20(1)(a)2, Stats., provides:

restrictive alternative. Secs. 51.20(13)(f), 51.45(13)

"**51.20 Involuntary commitment for treatment.** (1) PETITION FOR EXAMINATION. (a) Every written petition for examination shall allege that the subject individual to be examined:

". . . .

"(2) Is dangerous because the individual:

"a. Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm;

"b. Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm;

"c. Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself. The probability of physical impairment or injury is not substantial under this subparagraph if reasonable provision for the subject individual's protection is available in the community, if the individual is appropriate for placement under s. 55.06, or, in the case of a minor, if the individual is appropriate for services or placement under s. 48.13(4) or (11). The subject individual's status as a minor does not automatically establish a substantial probability of physical impairment or injury under this subparagraph; or

"d. Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness. No substantial probability of harm under this subparagraph exists if reasonable provision for the individual's treatment and protection is available in the community, if the individual can receive protective placement under s. 55.06 or, in the case of a minor, if the individual is appropriate for services or placement under s. 48.13(4) or (11). The individual's status as a minor does not automatically establish a substantial

(g), 55.06(9)(a).[5] Both afford their patients similar rights after the commitment or placement has been made. *See* secs. 51.61 and 55.07, **Patients' Rights.**

However, there are fundamental differences in the procedure employed in ch. 51 and ch. 55, Stats. Patients

---

probability of death, serious physical injury, serious physical debilitation or serious disease under this subparagraph."

Sec. 51.45(13)(a)2, Stats., provides:

"(13) INVOLUNTARY COMMITMENT. (a) A person may be committed to the custody of the community board by the circuit court upon the petition of 3 adults, each of whom has personal knowledge of the conduct and condition of the person sought to be committed. A refusal to undergo treatment shall not constitute evidence of lack of judgment as to the need for treatment. The petition for commitment shall:

". . . .

"2. Allege that such condition of the person is evidenced by a pattern of conduct which is dangerous to the person or to others;".

Sec. 55.06(2)(c), Stats., provides:

"(2) The department, an agency, a guardian or any interested person may petition the circuit court to provide protective placement for an individual who:

". . . .

"(c) As a result of developmental disabilities, infirmities of aging, chronic mental illness or other incapacities, is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to oneself or others. Serious harm may be occasioned by overt acts or acts of omission; and"

[5] Sec. 51.20(13)(f), Stats., provides:

"(13) DISPOSITION. . . .

"(f) The board established pursuant to s. 51.42 or 51.437 which receives an individual who is committed by a court under this section is authorized to place such individual in an approved treatment facility subject to any limitations which are specified by the court under par. (c)2. The board shall place the subject individual in the treatment program and treatment facility which is least restrictive of the individual's personal liberty, consistent with the treatment requirements of the individual. The board shall have ongoing responsibility to review the individual's needs,

committed under sec. 51.20 have time-limited commitments—six months for the first commitment and one year for subsequent ones—which must be renewed through a full due process court proceeding initiated by the party wishing to continue the commitment. Sec. 51.20(13)(g).[6] Patients placed under ch. 55 can have

in accordance with sub. (17), and transfer the person to the least restrictive program consistent with the individual's needs."

Sec. 51.45(13) (g), Stats., provides:

"(13) INVOLUNTARY COMMITMENT. . . . (g) The court shall make an order of commitment to the community board if, after hearing all relevant evidence, including the results of any diagnostic examination, the trier of facts finds: 1) that the allegations of the petition under par. (a) have been established beyond a reasonable doubt; and 2) that there is a relationship between the alcoholic condition and the pattern of conduct during the 12-month period immediately preceding the time of petition which is dangerous to the person or others and that such relationship has been established to a reasonable medical certainty; and 3) that there is an extreme likelihood that the pattern of conduct will continue or repeat itself without the intervention of involuntary treatment or institutionalization. The court may not order commitment of a person unless it is shown beyond a reasonable doubt that there is no suitable alternative available in which the person will voluntarily participate and that the community board is able to provide the most appropriate treatment and that the treatment is likely to be beneficial."

Sec. 55.06(9) (a), Stats., see footnote 3.

[6] Sec. 51.20(13) (g), Stats., provides:

"(g) 1. Except as provided in subd. 2, the first order of commitment of a subject individual under this section may be for a period not to exceed 6 months, and all subsequent consecutive orders of commitment of the individual may be for a period not to exceed one year.

"2. Any commitment ordered under par. (a)3 to 5, following proof of the allegations under sub. (1) (a)2.d, may not continue longer than 45 days in any 365-day period.

"3. The board under s. 51.42 or 51.437 to whom the individual is committed may discharge the individual at any time, and shall place a committed individual in accordance with par. (f). Upon application for extension of a commitment by the depart-

their placements continued for life with no court review unless the court, on its own motion, initiates a review or the ward, guardian or an agency or other interested person initiates the review. Secs. 55.06 (10) (a) and (b).[7]

The right to have confinement end, changed or be reviewed is recognized in sec. 51.20 (13) (g) 3, Stats. Protective placements under sec. 55.06 are the only involuntary commitments under Wisconsin law that are

---

ment or the board having custody of the subject, the court shall proceed under subs. (10) to (13). If the court determines that the individual is a proper subject for commitment as prescribed in sub. (1) (a) 1 and evidences the conditions under sub. (1) (a) 2 or (am), it shall order judgment to that effect and continue the commitment. The burden of proof is upon the board or other person seeking commitment to establish evidence that the subject individual is in need of continued commitment."

[7] Sec. 55.06 (10) (a) and (b), Stats., provides:

"(10) (a) The department or any agency which is responsible for a protective placement shall review the status of each person placed at least once every 12 months from the date of admission. The court in its order of placement may, however, require that such review be conducted more frequently. The review shall include in writing an evaluation of the physical, mental and social condition of each such person, and shall be made a part of the permanent record of such person. The review shall include recommendations for discharge or placement in services which place less restrictions on personal freedom, where appropriate. The results of the review shall be furnished to the department in such form as the department may require and shall be furnished to the court that ordered the placement and to the person's guardian.

"(b) The department, an agency, a guardian or a ward, or any other interested person may at any time petition the court for termination of protective placement. The petition shall allege that the conditions which warranted placement as specified in sub. (2) are no longer present. A petition shall be heard if a hearing has not been held within the previous 6 months but a hearing may be held at any time in the discretion of the court. Such petition shall be heard within 21 days of its receipt by the court."

indefinite in duration and thereby are tantamount to a life sentence to a nursing home or other custodial setting.

Petitioners argue this protective placement under ch. 55, Stats., violates equal protection in that no periodic, automatic reexaminations of the need for continued placement are required.

■

Petitioners object to the disparate treatment between ch. 51 and ch. 55, Stats. This court in *State ex rel. Terry v. Schubert,* 74 Wis. 2d 487, 499, 247 N.W.2d 109 (1976), stated: "The fundamental determination to be made when considering a challenge based upon equal protection is whether there is an arbitrary discrimination in the statute or its application, and thus whether there is a rational basis which justifies a difference in rights afforded. *Harris v. Kelley,* 70 Wis. 2d 242, 251, 234 N.W.2d 628 (1975)." There appears to be no rational basis for this distinction and individuals under ch. 55, protective placements, are being denied equal protection of the law.

Under sec. 55.06(10)(a) and (b), Stats., wards may obtain review of their condition. However, that review is inadequate because there is no requirement the court consider or review it. Granted the county protective services agency is required to annually review the person's protective placement, and the report is filed with the person's permanent record but copies of this report are only filed with the court that issued the placement order but with no requirement of court review or consideration.

Under sec. 55.06(10)(b), Stats., a guardian or a ward, or an agency or interested person may petition the court for a termination of a protective placement. However, this provision places the onus on the individual or another outside person to take some action to secure the court review. We find no rational purpose in placing the

burden to seek court review on the ward or guardian. Moreover, this type of review procedure has been rejected as being inadequate by other courts. *Doe v. Gallinot,* 657 F2d 1017 (9th Cir 1981). That court stated regarding the review initiation procedure:

"[T]heir protection is illusory when a large segment of the protected class cannot realistically be expected to set the proceedings into motion in the first place. It is the state, after all, which must ultimately justify depriving a person of a protected liberty interest by determining that good cause exists for the deprivation." *Id.* at 1023. (Footnote omitted.) *See also Johnson v. Solomon,* 484 F. Supp. 278 (D. Md. 1979) ; *Fasulo v. Arafeh,* 173 Conn. 473, 378 A. 2d 553 (1977).

Under sec. 880.38(3), Stats., a guardian is required to make an annual report to the court and protective services agency on the condition of his or her ward. However, this requirement may be satisfied by submitting the report developed by the protective services agency under sec. 55.06(10) (a).

Protectively placed individuals would greatly benefit from an impartial judicial review of their records. In many situations, the department of health & social services or the responsible protective services agency may be influenced in its decision making by the economics of the placement. If the person remains in the nursing home, this is cost free to the county. If the person is in a county operated nursing home, there may be pressure not to remove a person due to possible loss of revenue for the facility. If the person is sent from a nursing home, there may be a necessity for the state and county to purchase community services. None of these complications and potential conflicts are presently required to be reviewed by an impartial judicial officer to determine the advisability and permissibility of the continuation of the protective placement originally made by the court.

There is a strong presumption supporting the constitutionality of any classification made by the Wisconsin legislature. *State ex rel. La Follette v. Reuter,* 36 Wis. 2d 96, 109, 153 N.W.2d 49 (1967) ; *Servonitz v. State,* 133 Wis. 231, 239, 113 N.W. 277 (1907).

"Thus when the presumption of constitutional validity is combined with the standards of classification, it follows that the presumption is superimposed upon the standards so that to declare an act of the legislature as to a classification violative of the equal-protection clause, it is first necessary to prove that the legislature has abused its discretion beyond a reasonable doubt." *La Follette v. Reuter,* 36 Wis. 2d at 111.

Moreover, "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." *Baxstrom v. Herold,* 383 U.S. 107, 111 (1966), citing *Walters v. City of St. Louis,* 347 U.S. 231, 237 (1954). The distinction between commitment and placement in the two statutes has a rational basis ; however, the same rational foundation is not present when considering procedural requirements of periodic review in the one and not the other statute.

In *Jackson v. Indiana,* 406 U.S. 715, 729 (1972), the Supreme Court applied *Baxstrom* and stated: "The harm to the individual is just as great if the State, without reasonable justification, can apply standards making his commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release."

The United States Supreme Court has considered constitutional rights of individuals involuntarily committed due to mental illness and the effect on such persons of that commitment. In considering commitment due to

mental illness, the Supreme Court in *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975), stated that:

" '[M]ental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.

"May the State confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community? That the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution."

Chief Justice Burger, in his concurring opinion at 580, stated:

"Commitment must be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons no longer exist."

In *Vitek v. Jones*, 445 U.S. 480, 491–92 (1980), the Court recognized that commitment produces " 'a massive curtailment of liberty,' " citing *Humphrey v. Cady*, 405 U.S. 504, 509 (1972). The Court continued by stating that:

"The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital 'can engender adverse social consequences to the individual' and that '[w]hether we label this phenomena "stigma" or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual.' " Citing *Addington v. Texas*, 441 U.S. 418, 425–26 (1979).

In *Vitek,* the Court was considering the transfer of a prisoner to a mental hospital but the effect is the same with involutary commitments or placements, *i.e.,* loss of liberty, adverse social consequences, intrusion on personal security. In light of these facts and the United States Supreme Court's holdings in the above cases, we cannot find the rationality necessary to support the legislation at issue as written.

Section 55.001, Stats., has stated the purpose and policy of the legislation as follows:

"**55.001 Declaration of policy.** The legislature recognizes that many citizens of the state, because of the infirmities of aging, chronic mental illness, mental retardation, other developmental disabilities or like incapacities incurred at any age, are in need of protective services. These services should, to the maximum degree of feasibility, allow the individual the same rights as other citizens, and at the same time protect the individual from exploitation, abuse and degrading treatment. This chapter is designed to establish those services and assure their availability to all persons *when in need of them,* and to place the least possible restriction on personal liberty and exercise of constitutional rights consistent with due process and protection from abuse, exploitation and neglect." (Emphasis added.)

The judicial review required by sec. 51.20(13)(g)3, Stats., is a recognition by the state of the appropriate procedure and having so determined, the absence of that procedure for periodic review in sec. 55.06 does not serve any rational purpose, much less a compelling state interest.[8]

---

[8] The United States Supreme Court has traditionally analyzed equal protection challenges by invoking one of two levels of judicial scrutiny. Where a statute involves fundamental interests or rights, or where it involves suspect classifications or "discrete and insular minorities," *United States v. Carolene Products Co.,* 304 U.S. 144, 153 n. 4 (1938), the court has required the classification be necessary to achieve or promote a compelling state interest

There are other reasons to support our holding that there is no rational basis for the absence of an annual automatic court review under ch. 55, Stats. Sec. 55.02 and that the means chosen be carefully tailored and no less drastic means be available. *See San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 16–17 (1972) and cases cited therein. *See generally* Wilkinson, *The Supreme Court, The Equal Protection Clause, and the Three Faces of Constitutional Equality*, 61 Va. L. Rev. 945, 950 (1975). Where a suspect class or fundamental interest is not involved, as with ordinary economic regulation, the court has applied a test requiring a legitimate state interest and has upheld classifications if they are in any way rationally related to the asserted purpose of the legislation. *See McDonald v. Bd. of Election Comm'rs.*, 397 U.S. 802, 809 (1964).

Recently, the Supreme Court has analyzed some equal protection challenges by applying a middle level tier of judicial scrutiny, which has been termed "vigorous rational basis scrutiny" or the traditional standard "with new bite," which requires the classification be justified by a "substantial interest." *Plyler v. Doe*, 457 U.S. 202, 218, n. 16, 224 (1982), *see generally*, Gunther, *The Supreme Court, 1971 Term—Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 22, 31 (1972). Some have suggested that in cases involving classifications among classes of mentaly ill, courts should apply this middle level or even the heightened level of scrutiny. The Supreme Court has not expressly declared what standard of review should apply in this area. Some commentators urge strict scrutiny be applied. *E.g.* Kirschner, *Constitutional Standards for Release of the Civilly Committed and Not Guilty by Reason of Insanity: A Strict Scrutiny Analysis*, 20 Ariz. L. Rev. 233 (1978); Note, *Mental Illness: A Suspect Classification?*, 83 Yale L. J. 1237 (1974). Moreover, some courts and commentators have interpreted the Supreme Court in *Baxstrom v. Herold*, 383 U.S. 107 (1965), *Humphrey v. Cady*, 405 U.S. 504 (1972), and *Jackson v. Indiana*, 406 U.S. 715 (1972), to have already applied the middle level of scrutiny. *Cf. Benham v. Edwards*, 678 F.2d 511, 515–16, n. 9 (5th Cir 1982), *but cf. United States v. Cohen*, 733 F.2d 128, 132–36 (D.C. Cir. 1984).

Though we recognize some courts and commentators advocate a heightened level of judicial scrutiny in assessing the rationality of disparate treatment accorded the mentally ill, we conclude

declares that "the protective service system shall be designed to encourage independent living and to avoid protective placement whenever possible." This recognizes that the mere fact that an individual has failed to respond to treatment in the past does not necessarily indicate untreatability or permanence with no hope for a positive effect of new medical and social attitudes and developments. *Guardianship & Protective Placement of Shaw*, 87 Wis. 2d 503, 515, 275 N.W.2d 503 (Ct. App. 1979). Section 55.06(2)(d), Stats., requires a disability to be permanent or "likely to be permanent" for protective placement. The acceptance of a condition only "likely to be permanent" allows the possibility of protective placement for impermanent disability. Thus, the individual's incompetence, need for residential care and custody or risk of harm may change with time. It is because this possibility exists that we hold protectively placed individuals are entitled to the right of periodic, automatic judicial review that all other civilly committed persons in Wisconsin have. The absence of periodic, automatic judicial review does not rationally relate nor further the stated goals and policy objectives of the chapter.

To uphold the constitutionality of sec. 55.06, which is a reflection of society's recognition of responsibility to variously disabled persons, this court is asked to fashion a remedy by choosing among the following options:

(1) Require annual implementation of the procedure used in Milwaukee county for initial guardianship and protective placement actions. We hold it is not necessary for equal protection purposes to annually commence the procedure as if it were the initial petition for placement.

here that a decision as to the precise level of scrutiny required by the equal protection clause need not be made for the dissimilar treatment accorded between ch. 51, and ch. 55, Stats., does not survive even the lowest and most deferential equal protection scrutiny.

A periodic consideration by a court affords an independent, impartial reconsideration of the existing circumstances of the placed person.

(2) Adopt the procedure set forth in sec. 51.20(13) (g)3, Stats. We find this cumbersome and unnecessary. Section 55.06 provides for residential care and custody of those persons with mental disabilities that are likely to be permanent. Chapter 51 provides for active treatment for those who are proper subjects for treatment. *In Matter of Athans,* 107 Wis. 2d 331, 337, 320 N.W.2d 30 (Ct. App. 1982). The distinction between these two statutes is significant enough that the same procedures in one may not be required nor appropriate in the other for equal protection to be satisfied. When considering equal protection, rights need not necessarily be the same and in some situations sameness may be impossible or unnecessary. The rights when compared must be evenly proportioned or balanced to reflect the different circumstances of each classification.

(3) The third alternative presented to the court is the most appropriate and persuasive procedure for assuring the protectively placed individuals the equal protection of ch. 51, Stats., committees. We hold that there must be an annual review of each protective placement by a judicial officer. The court should appoint a guardian ad litem to meet with the placed individual and to review the annual report made by the protective services agency under sec. 55.06(10)(a). The guardian ad litem should explain to the placed individual and his or her guardian the right to have an attorney appointed, to an independent evaluation, and to request a full due process hearing on the need for continued protective placement or on the appropriateness of the present placement facility. The guardian ad litem should request an additional evaluation of the individual if that appears necessary. Using all of the information gathered, the guardian ad litem should make a report to the court concerning whether the individual continues to meet the standards

for protective placement, whether the current placement is the least restrictive environment consistent with the individual's needs, whether the individual or guardian requests a change in status or placement, whether counsel should be appointed, and whether a full due process hearing should be held.

Upon its review of the report of the guardian ad litem, the court should decide whether to order additional information, whether to appoint defense counsel, and whether to hold a full due process hearing under sec. 55.06(6), Stats.,[9] or a summary hearing.

A full due process hearing should be required whenever the protectively placed individual, his or her guardian or the guardian ad litem requests it or when the report of the guardian ad litem indicates that the individual no longer meets the standards for protective placement, the current placement is not the least restrictive environment or the individual objects to the present placement. Lastly, the annual review of the necessity for a hearing and the hearing, if necessary, may be conducted by a court commissioner pursuant to sec. 757.69(1)(h), Stats.[10]

---

[9] Sec. 55.06(6), Stats., provides:

"(6) Section 880.33(2) applies to all hearings under this chapter except for transfers of placement under sub. (9)(b), (c) and (e). A person to be protected shall have a guardian ad litem who is an attorney appointed in accordance with s. 757.48(1) present at all hearings under this chapter if the person does not have full legal counsel. The court may, however, excuse a personal appearance by a guardian ad litem based on information contained in a written report by the guardian ad litem to the court. If the person is indigent, the county of legal settlement shall be liable for guardian ad litem fees. The subject individual, attorney or guardian ad litem shall have the right to present and cross-examine witnesses, including any person making an evaluation or review under sub. (8)(c)."

[10] Sec. 757.69(1)(h), Stats., provides:

"(h) Hear petitions for commitment and conduct probable cause hearings under ss. 51.20 and 51.45, advise a person alleged to

The initial annual review of protective placement required by this decision for those persons already in protective placement shall be accomplished within one year from the mandate date of this opinion.

In the alternative, petitioners argue protective placement under ch. 55, Stats., violates due process in that no periodic, automatic reexaminations of the need for continued protective placement are required. This court has considered the state and federal constitutions[11] and their requirements and have found them similar with respect to due process and equal protection. *State ex rel. Farrell v. Stovall,* 59 Wis. 2d 148, 158, n 20, 207 N.W.2d 809 (1973), (*see also* cases cited therein).

In *Parham v. J.R.,* 442 U.S. 584, 607 (1979), the United States Supreme Court discussed due process requirements stating that due process has never been thought to require the neutral and detached trier of fact be law-trained or be a judicial or administrative officer. In medical decisions neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric opinions. "Thus, a staff physician

---

be mentally ill of his or her rights under the United States and Wisconsin constitutions and, if the person claims or appears to be unable to afford counsel, refer the person to the authority for indigency determinations specified under s. 977.07(1)."

[11] Art. XIV, sec 1, United States Constitution provides:

"SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Art. 1, sec. 1, Wisconsin Constitution provides:

"**Equality; inherent rights.** SECTION 1. All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."

will suffice, so long as he or she is free to evaluate independently the child's [ward's] mental and emotional condition and need for treatment." That Court also held it is not necessary for the deciding physician to conduct a formal hearing and that due process is not violated by the use of informal, traditional medical investigative techniques. *Id.* at 607. The Court stated: "Not every determination by state officers can be made most effectively by use of 'the procedural tools of judicial or administrative decisionmaking.' " *Id.* at 608.

Consequently, there is an issue whether the lack of a periodic judicial review of protective placement in ch. 55, Stats., is lacking in due process since the protection afforded by sec. 55.06(10)(a), under the *Parham* analysis, may be sufficient protection of wards. But because we find the lack of periodic, automatic review violates equal protection, we need not address this issue here.

The second issue in this case is whether sec. 55.06(9) (d) and 55.06(9)(e), Stats., are greatly similar in purpose and scope to secs. 51.15 and 51.20, so that they may not deny basic procedural protections to persons facing involuntary hospitalization, if they are to comport with the requirements of equal protection. In other words, are subsecs. 55.06(9)(d) and 55.06(9)(e) constitutional insofar as they allow involuntary mental hospitalization of protectively placed wards without the requirements of the mental commitment law.

In *State ex rel. Farrell v. Stovall*, 59 Wis. 2d 148, 160, we stated that a prerequisite to the application of equal protection analysis to disparate involuntary commitment procedures is that the commitment laws be "greatly similar in purpose and scope." In *Farrell* this court was analyzing whether the 1951 Wisconsin sex crimes law (ch. 975, Stats.) [12] and ch. 51 (Mental Health Act) were properly comparable in the sense of dealing with

---

[12] Ch. 117, Laws of 1979 repealed sec. 975.01, Stats. 1977, and recreated it to preclude commitment under ch. 975 after July 1, 1980.

the same group or class of persons. The court found the acts were "greatly similar in purpose and scope" and held at 162: "It is therefore clear that the two Acts, the civil commitment statute and the sex crimes statute, are virtually identical in purpose and scope." This holding was based on the pervasive theme of both acts as being treatment of the individual and protection of the community. We stated in *Farrell* at 164: "Present, therefore, in both statutes is a weighing factor or 'balancing test' that the person is sufficiently ill to present a danger to himself or the community and that he is in need of treatment." In *Farrell*, we held there was no justification in denying a jury trial in the sex deviate recommitment proceedings since such jury right was granted by statute in an involuntary commitment determination proceeding of ch. 51.

In secs. 51.15–51.20, Stats., and sec. 55.06(9)(d) and (e) there are striking similarities between the involuntary hospitalization procedures of the mental commitment law and transfer of placement of a ward to a facility providing acute psychiatric diagnostic procedures under subsec. (d) and treatment under subsec. (e). These similarities are greater in purpose and scope than those respectively compared in *Farrell*.

Both the civil commitment law and sec. 55.06(9)(d) and (e), Stats., are civil statutes, unlike the civil—criminal comparison in *Farrell*. The type of treatment that these civil statutes intend is identical, acute psychiatric treatment for mental illness, development disability or drug dependence. In *Farrell*, the court was comparing psychiatric treatment of civilly committed individuals to treatment of criminally committed individuals with sexual disorders or mental illness.

Section 55.06(9)(d), Stats., is identical in purpose and scope to the pretrial detention provisions of the mental commitment law. Under subsecs. (7), (8) and (9) of sec. 51.20, an individual can be held in pretrial detention for up to fourteen days. During this period,

the detained individual can refuse treatment, sec. 51.20 (8)(c), but will be evaluated by two court-appointed mental health examiners, sec. 51.20(9). For the individual confined under this provision, the effects of confinement are indistinguishable from the confinement of an individual under sec. 55.06(9)(d).

The person confined for "psychiatric diagnostic procedures" under sec. 55.06(9)(d), Stats., is denied rights that are accorded persons who are involuntarily confined in pretrial detention under sec. 51.20, *i.e.,* the automatic appointment of a lawyer (sec. 51.20(3)), notice of hearings, rights and allegations, (sec. 51.20(2)), and an automatic judicial hearing within 72 hours of detention at which the court may authorize further detention only if it finds probable cause to believe that the individual is *committable* under *criteria of sec. 51.20(1)* (sec. 51.20(7)).

The involuntary hospitalization provisions of sec. 55.06 (9)(e), Stats., are substantially similar in their effect of involuntary commitment following a final hearing under sec. 51.20. In both cases, individuals may be confined and treated against their will. The differences are in the procedural and substantive rights denied to persons involuntarily hospitalized under sec. 55.06(9)(e) that are afforded persons facing commitment under sec. 51.20, *i.e.,* automatic appointment of a lawyer, notice of hearings and allegations, and no involuntary commitment unless the court finds after a hearing that there is clear and convincing evidence that the subject individual is mentally ill, a proper subject for treatment and is dangerous.

We must determine whether there is a rational basis to justify the distinction in rights granted persons in similar classes or groups of ch. 51, Stats., and sec. 55.06 (9)(d) and (e).

Chapter 51, Stats., application requires that a person be rehabilitable. Section 55.06 requires that a person

have a permanent condition that requires only "care and custody," rather than active treatment. However, once an individual in protective placement faces involuntary mental hospitalization under sec. 55.06(9)(d) or 55.06 (9)(e), he is in the same relationship with the state as is the person facing immediate hospitalization under ch. 51. Section 51.15 allows for immediate hospitalization on the motion of a police officer. Section 51.20(2) allows for immediate hospitalization on the ex parte order of a judge or court commissioner upon the petition of three adults.

Under sec. 55.06(9)(d) and 55.06(9)(e), Stats., the only recourse available to an involuntarily hospitalized individual is to petition the court for a hearing under sec. 55.06(9)(b).[13] This latter section requires the court to determine if there is probable cause to believe that the involuntary hospitalization is consistent with the general

---

[13] Sec. 55.06(9)(b), Stats., provides:

"(b) Transfer may be made between placement units or from a placement unit to a medical facility other than those specified in pars. (c) to (e) by a guardian or placement facility without approval by a court. When transfer is made by a placement facility, 24 hours' prior written notice of the transfer shall be provided to the guardian, when feasible. If it is not feasible to notify the guardian in advance, written notice shall be provided immediately upon transfer, and notice shall also be provided to the court and to the board designated under s. 55.02 or an agency designated by it within a reasonable time, not to exceed 48 hours from the time of the transfer. Upon petition to a court by a guardian, ward, or attorney, or other interested person specifying objections to a transfer, the court shall order a hearing, within 96 hours after filing of the petition, to determine whether there is probable cause to believe that the transfer is consistent with the requirements specified in par. (a) and is necessary for the best interests of the ward. The court shall notify the ward, guardian and petitioner of the time and place of the hearing, and a guardian ad litem shall be appointed to represent the ward. If the person is indigent, the county of legal settlement shall be liable for guardian ad litem fees. The petitioner, ward and guardian shall have the right to attend, and to present and cross-examine witnesses."

requirements of sec. 55.06(9)(a) and is in the ward's best interest.

There is no rational basis for the procedural protections given persons being involuntarily hospitalized under the provisions of ch. 51, Stats., and the lack of any procedural protections except for self-requested ones in sec. 55.06(9)(b). Therefore, the court holds that the guarantee of equal protection requires that the requirements of secs. 51.15 and 51.20 be afforded protectively placed individuals facing involuntary commitment under sec. 55.06(9)(d) and 55.06(9)(e).

Petitioners' last issue, whether guardians have statutory authority to consent to mental hospitalization of wards who do not consent to such hospitalization, is controlled by our holding in the second issue above. Petitioners argue if this court declares sec. 55.06(9)(d) and 55.06(9)(e), Stats., unconstitutional, in that guardians cannot involuntarily hospitalize their protectively placed wards, then *a fortiori* guardians cannot involuntarily hospitalize wards who are not protectively placed without going through the procedures in sec. 51.20. We stated in the second issue that equal protection requires the requirements of secs. 51.15 and 51.20 be applied to individuals protectively placed and facing involuntary commitment under sec. 55.06(9)(d) and 55.06(9)(e). Here those same requirements and procedures apply. It would be inconsistent to hold guardians of wards under protective placement must comply with the requirements of secs. 51.15 and 51.20 in order to involuntarily hospitalize their wards and at the same time hold guardians of wards not under protective placement do not have to comply or have available the requirements of secs. 51.15 and 51.20 but remain free to consent to the involuntary hospitalization of their wards. Guardianship by itself does not justify the involuntary hospitalization of an adult ward, *see* sec. 51.10(8), without the procedural

protections presently afforded under secs. 51.15 and 51.20 or escape the demands of equal protection.

In conclusion, in order for lack of periodic judicial review of confinement under ch. 55, Stats., and the lack of substantive and procedural safeguards pursuant to sec. 55.06(9)(d) and (e) to survive an equal protection challenge, the treatment accorded individuals under that chapter, when compared to the disparate treatment required in ch. 51, must have a "rational basis." We agree with the following statement:

"The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different remedies. Or so the legislature may think. . . . Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. . . . The legislature may select one phase of one field and apply a remedy there, neglecting the others. . . ." *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955).

However, the legislature has expressly stated ch. 55, Stats., should "allow the individual the same rights as other citizens, and at the same time protect the individual from exploitation, abuse, and degrading treatment" and that it "is designed to establish those services and assure their availability to all persons when in need of them, and to place the least possible restriction on personal liberty . . . ." Sec. 55.001. The legislature also has expressly stated ch. 51 should be part of a "unified system" and should "assure all people in need of care access to the least restrictive treatment alternative appropriate to their needs." Sec. 51.001. The stated policies of these two chapters do not imply, nor are we of the opinion, that chs. 51 and 55 are concerned with problems to society of different dimensions and proportions such that they need different procedures. Inasmuch as ch. 51 emphasizes short-term treatment and ch. 55 emphasizes long-term care, the length of confinement is distinguished

from the particular kind or quality of treatment. The legislature has made it clear in both chs. 51 and 55 that restrictive treatment alternatives should cease when less restrictive alternatives appear. Though clearly reform may take one step at a time, here there can be little doubt the legislature intended both chapters accomplish not just the appropriate kind of treatment, but that it be applied in the least restrictive manner. Chapter 51 provides for a means of accomplishing this goal by requiring periodic judicial review under sec. 51.20(13)(g) and specific substantive and procedural safeguards under secs. 51.15 and 51.20. Chapter 55, though ostensibly promoting the same goals, does not provide for such review and safeguards and we can find no rational reason for this disparity.

*By the Court.*—The judgment of the circuit court is reversed.

MOTION FOR RECONSIDERATION. *Denied.*

PER CURIAM. Milwaukee county's motion and amended motion for reconsideration do not challenge the holding of the court, namely, that ch. 55 unconstitutionally deprives individuals of an automatic periodic reexamination of the need for continued protective placement, that the constitution requires that the procedural requirements set forth in secs. 51.15 and 51.20 be afforded to protectively placed individuals facing involuntary commitment under sec. 55.06(9)(d) and 55.06(9)(e), and that a guardian does not have statutory authority to consent to hospitalization of an adult ward who is not protectively placed and who has not consented to such hospitalization. Rather than challenging the holding of the court, the motion and amended motion for reconsideration raise issues that might arise in the future but as yet have not. Therefore the motion for reconsideration is denied.