COURT OF APPEALS
DECISION
DATED AND FILED

October 30, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2025AP269**

**STATE OF WISCONSIN**

Cir. Ct. No.  2021GN44

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE PROTECTIVE PLACEMENT OF M.A. :

LA CROSSE COUNTY AND S.A.A.,

    PETITIONERS-RESPONDENTS,

  V.

M.A.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for La Crosse County: GLORIA L. DOYLE, Judge. *Reversed.*

¶1    TAYLOR, J.[1]  M.A. appeals a circuit court order continuing his protective placement under WIS. STAT. ch. 55.  M.A. argues that the evidence

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

adduced at the hearing was insufficient to satisfy two criteria for protective placement. Specifically, M.A. argues that petitioner S.A.A., who is M.A.'s mother and guardian, did not present clear and convincing evidence that M.A. is in continuing need of protective placement by establishing that M.A.: (1) has a primary need for residential care and custody; and (2) is so totally incapable of providing for his own care or custody as to create a substantial risk of serious harm to himself or others, which may be evidenced by overt acts or acts of omission. *See* WIS. STAT. § 55.08(1)(a) and (c). I conclude that the evidence was insufficient to continue M.A.'s protective placement. Accordingly, I reverse the order.[2]

## BACKGROUND

¶2 In 2021, S.A.A. petitioned the circuit court to be named M.A.'s guardian pursuant to WIS. STAT. § 54.34 and to have M.A. protectively placed pursuant to WIS. STAT. § 55.08(1). Both petitions were granted. The protective placement was to M.A.'s private house, where he lived alone.

¶3 In the spring of 2024, S.A.A. filed requests to modify M.A.'s protective placement by ordering placement in a facility with a higher level of

---

[2] M.A. separately argues that the order continuing his protective placement does not comply with statutory requirements because, rather than designating a specific facility or directing La Crosse County to identify the least restrictive environment for M.A., it delegates that determination to M.A.'s "treatment team." *See* WIS. STAT. § 55.18(3)(e)2. Because I reverse the protective placement order on other grounds, I do not address this issue. *See **Lamar Cent. Outdoor, LLC v. DHA***, 2019 WI 109, ¶41, 389 Wis. 2d 486, 936 N.W.2d 573 ("'An appellate court need not address every issue raised by the parties when one issue is dispositive.'" (quoted source omitted)).

restrictiveness, and to transfer additional powers to S.A.A. as M.A.'s guardian.[3] *See* WIS. STAT. § 54.63(1) (guardian may petition the court for expansion of guardianship).

¶4     The circuit court set a dual-purpose hearing at which it would consider S.A.A.'s requests for a more restrictive placement and additional powers as guardian, and also conduct an annual due process review of the protective placement under WIS. STAT. § 55.18(3)(d) as requested by M.A.  Although the Corporation Counsel for La Crosse County ("the County") appeared at the hearing, the County did not call or examine witnesses or take a position on the continuation of the protective placement.

¶5     S.A.A. called one witness: Dr. Stephen Dal Cerro, a psychologist who she had retained and who prepared a report that was received into evidence. In support of continuing the protective placement, Dal Cerro testified to the following.  Dal Cerro had performed three evaluations of M.A., with the most recent occurring the month before the hearing.  M.A. has paranoid schizophrenia. When experiencing active symptoms, M.A. has impaired cognition, "can't think rationally," and has poor impulse control.  M.A. does not acknowledge a need for medication, and "when he has an opportunity to resist medications…, he does." Even when M.A. is medicated, "the symptoms of his illness are apparent."

---

[3] From these and associated filings here, it appears that M.A. had been detained and involuntary committed under WIS. STAT. ch. 51 earlier in 2024 and was subject to an involuntary treatment order as a result.  These orders appear to have been in existence at the time of the WIS. STAT. ch. 55 review hearing at issue here.  M.A.'s ch. 51 involuntary commitment is not at issue in this appeal.

¶6     In terms of M.A.'s conduct when medicated, Dal Cerro testified as follows.  M.A.'s existence is "sort of vegetative," he "really doesn't take any initiative" to care for himself, and S.A.A. provides him with meals.  Although M.A.'s delusions and impulsive behaviors diminish when he is medicated, he lacks motivation and volition, "which means that he becomes sort of subject to the influence of … stronger personalities."  S.A.A. had indicated to Dal Cerro that M.A. has a pattern of allowing people "into the house who sort of took over the home" and "were able to somewhat take over whatever finances [M.A.] had available."  Dal Cerro had reviewed photographs provided by S.A.A. of the inside of M.A.'s house, which Dal Cerro described as "trashed."

¶7     Dal Cerro concluded that, in his opinion, M.A. has a primary need for residential care and custody because "he has a fundamental inability to meet his basic needs and ensure personal safety on his own."  Explaining further, Dal Cerro stated that the least restrictive setting for M.A. would be a group home with 24-hour monitoring and supervision; and that M.A. should be subject to an involuntary medication order.  When asked specifically why he believed an involuntary medication order was necessary, Dal Cerro cited prior allegations of violence at some unspecified time in the past by M.A. against his parents, "sexually transgressive behaviors," a "low-speed police chase" occurring at some unspecified time in the past, a 2014 motor vehicle accident that M.A. had been involved in in which M.A. had received a civil settlement, and M.A. having received some injuries in a bicycling accident.

¶8     M.A. called psychologist Dr. James Black, who had been retained by the County and had examined M.A. a month before the hearing.  Black testified as follows.  M.A. primarily needs an involuntary commitment (which the filings in this case suggest was then in effect) under WIS. STAT. ch. 51 to ensure medication

4

compliance, and M.A. could stay in his own house with such services because M.A. had

> lived independently for quite a while. It's probably not something in the style that we would prefer. Marginal, I think would be a nice term [for] how he lives. But he's [lived] independently and he can meet his basic [activities of daily living]. The issue is medication compliance. And if he's compliant with medications, he can maintain a level of stability that allows him to live in an independent setting.

¶9 Black concluded the following. M.A. does not need other people to assist in his care and, with medication compliance, M.A. would be "primarily stable in the sense that he's able to function." M.A.'s condition had improved since he had been medicated under his WIS. STAT. ch. 51 involuntary commitment. Although M.A.'s existence in the past had been "marginal," "we generally don't lock people up because they don't take showers regularly or maintain [] clean surroundings. It's not desirable, but it doesn't put somebody at substantial risk and that's the required threshold."

¶10 The circuit court continued M.A.'s protective placement and modified the order to provide that M.A.'s least restrictive placement would be in a "facility with 24-hour care and supervision such as a licensed hospital, [community-based residential facility], or [adult family home] with monitored egress." The order permitted M.A. to be moved to a less restrictive setting than

these facilities "at the discretion of his treatment team."[4]  M.A. appeals the protective placement order.[5]

## DISCUSSION

### I. Standard of review

¶11    An appellate court reviews a protective placement order under WIS. STAT. ch. 55 using a mixed standard of review.  A circuit court's factual findings will not be set aside unless they are clearly erroneous.  WIS. STAT. § 805.17(2). Here, the circuit court checked boxes on a standard form regarding its factual findings.  M.A. asserts on appeal that the evidence given at the hearing was insufficient to meet the requirements for a continued protective placement.  This is

---

[4] The circuit court also modified M.A.'s guardianship order and entered an order for protective services which included the involuntary administration of medication.  M.A. has not appealed those orders.

[5] M.A. submitted his appellant's brief in this case in April of 2025.  None of the potential filers of response briefs—the County, S.A.A., or M.A.'s guardian ad litem—filed a brief within the deadline.  After the deadline had passed, the guardian ad litem and the County each filed letters informing me that they did not intend to file briefs.  The County explained that it had not sought the modified protective placement being appealed, and that it did not take a position on whether that order should be affirmed or reversed.  After I issued an order informing S.A.A. that the protective placement order would be summarily reversed if she did not file a brief within five days, S.A.A. requested and was granted two successive extensions of that deadline before filing a pro se response brief.

Given this history, briefing was not completed until August 2025, more than a year after the circuit court entered the order extending M.A.'s protective placement.  Therefore, another annual review of the protective placement should have occurred by now.  *See State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.*, 122 Wis. 2d 65, 84-85, 362 N.W.2d 104 (1985) (requiring an annual review of the necessity of a protective placement and, if necessary, a "full due process hearing" on the need for continued protective placement).  Because protective placement cases are confidential, I do not have access to any information about what has occurred since the record was transmitted to this court in February of this year.  Neither party has informed me that this appeal may be moot or otherwise affected by any such annual review.  Accordingly, I address the appeal as submitted.

an issue of law that appellate courts review de novo. *See Coston v. Joseph P.*, 222 Wis. 2d 1, 23, 586 N.W.2d 52 (Ct. App. 1998) (The issue of whether the evidence satisfies the legal standard for protective placement is a question of law that we review de novo.).

## II. Chapter 55 protective placements and annual reviews

¶12    A protective placement is "'a massive curtailment of liberty.'" *State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.*, 122 Wis. 2d 65, 80, 362 N.W.2d 104 (1985) (quoting *Vitek v. Jones*, 445 U.S. 480, 491-92 (1980)).  To help ensure that such a "massive curtailment" is imposed only when necessary, persons subject to a protective placement order are entitled to annual reviews to determine whether the protective placement should be terminated or modified.  WIS. STAT. § 55.18; *Watts*, 122 Wis. 2d at 84.  Under some circumstances, the circuit court may conduct a summary, non-evidentiary review hearing.  But where, as here, the protectively-placed person requests it, the court must hold a full due process hearing.  § 55.18(3)(d)1; *Watts*, 122 Wis. 2d at 85.

¶13    In a WIS. STAT. ch 55 due process review, a protective placement may not be continued unless it is shown by clear and convincing evidence that the subject continues to satisfy the same four criteria necessary for an original protective placement.  WIS. STAT. § 55.10(4) and (4)(d).  To continue M.A.'s protective placement, the circuit court here was required to find that M.A. meets all of the following standards: (1) He had "a primary need for residential care and custody"; (2) He has "been determined to be incompetent by a circuit court"; (3) "[a]s a result of … serious and persistent mental illness, … [he] is so totally incapable of providing for his … own care or custody as to create a substantial risk

of serious harm to himself … or others"; and (4) he "has a disability that is permanent or likely to be permanent." WIS. STAT. § 55.08(1)(a)-(d).

¶14 On appeal, M.A. does not dispute that he has been found incompetent by a circuit court, nor that his disability is permanent. *See* WIS. STAT. § 55.08(1)(b) and (d). Instead, M.A. contends that the evidence did not show that he has a primary need for residential care and custody under § 55.08(1)(a), nor that he is so totally incapable of providing for his own care and custody that he poses a significant risk of substantial harm to himself or others under § 55.08(1)(c). For the following reasons, I agree.

### III. Primary need for residential care and custody

¶15 As to the first of these disputed standards, this court has held that the phrase "primary need for residential care and custody" as used in WIS. STAT. § 55.08(1)(a) means a "primary need (1) to have … daily needs provided for in a residential setting; and (2) to have someone else exercising control and supervision in that residential setting for the purpose of protecting the person from abuse, financial exploitation, neglect, and self-neglect." *Jackson Cnty. DHHS v. Susan H.*, 2010 WI App 82, ¶16, 326 Wis. 2d 246, 785 N.W.2d 677. "A need for treatment does not constitute a 'primary need for residential care and custody.'" *Id.*, ¶11. In determining whether the individual has a primary need for residential care and custody, "the [circuit] court must consider the availability of treatment or protective services, and order protective placement only if it is the least restrictive alternative." *Zander v. County of Eau Claire*, 87 Wis. 2d 503, 514, 275 N.W.2d 143 (Ct. App. 1979).

¶16 The hearing testimony in support of M.A. having a primary need for residential care and custody came from Dal Cerro. When asked why he believed

this need existed, Dal Cerro replied that M.A. has a "fundamental inability to meet his basic needs and ensure personal safety on his own." Dal Cerro went on to testify that when medicated, M.A. does not prepare his own meals, but instead receives them from his mother. Dal Cerro's testimony also suggested that he believed M.A. could be subject to "financial exploitation." *See Susan H.*, 326 Wis. 2d 246, ¶16 (a protective placement is allowed if the person cannot protect themselves from abuse, financial exploitation, neglect, and self-neglect, necessitating the control and supervision by others).

¶17 I conclude that Dal Cerro's testimony was insufficient to show that M.A. has a primary need for residential care and custody. Although Dal Cerro began by asserting that M.A. has a "fundamental inability" to care for himself, Dal Cerro's testimony did not provide specific evidence that would support this claim. While Dal Cerro described M.A. when medicated as "sort of vegetative," and said he "really doesn't take any initiative" to care for himself, he provided no testimony about any particular needs M.A. has that, in Dal Cerro's view, were going unmet within M.A.'s home such that he was suffering neglect or self-neglect and needed the control and supervision of another. The only specific "need" Dal Cerro discussed was food, which he explained M.A. receives from his mother.

¶18 Regarding Dal Cerro's testimony that M.A. could be financially exploited, it too lacked specifics. Dal Cerro said only that "somewhat random" people had "somewhat take[n] over" M.A.'s finances. Without more detail, it is difficult to discern whether these asserted facts add up to "financial exploitation" such that M.A. has a "need … to have someone else exercising control and supervision" over him. *Id.* And although Dal Cerro's report was received into evidence, it is also vague on this point, repeatedly mentioning "financial exploitation" without providing any further description or examples. The report

also adds that S.A.A., as M.A.'s guardian, "closely controls [M.A.]'s funds" to prevent him from spending impulsively or giving money away.

¶19    In sum, Dal Cerro's testimony, which was the only evidence offered in support of the assertion that M.A. had a continuing, primary need for residential care and custody, falls short of satisfying S.A.A.'s burden to demonstrate that M.A. meets this standard by clear and convincing evidence.

### IV.  Substantial risk of serious harm

¶20    To meet the third criterion for protective placement under WIS. STAT. ch. 55, S.A.A. is required to show that M.A., due to disability, "is so totally incapable of providing for his … own care or custody as to create a substantial risk of serious harm to himself … or others."  WIS. STAT. § 55.08(1)(c).  As M.A. points out, the standard is not "risk of serious harm," nor "substantial risk of harm," but "substantial risk of serious harm."  "The risk of harm must be substantial.  Mere speculation as to difficulties [a ward] may encounter is not sufficient.  Specific harm must be foreseeable to fulfill this requirement.  Furthermore, the foreseeable harm must be serious.... [M]inor accidents, injuries and illness are not sufficient to satisfy this requirement." *Zander*, 87 Wis. 2d at 514-15; *see also* ***K.N.K. v. Buhler***, 139 Wis. 2d 190, 202, 407 N.W.2d 281 (Ct. App. 1987) ("The harm envisioned may not be based on mere speculation but must be directly foreseeable ....").

¶21    Here again, Dal Cerro's testimony failed to meet the statutory standard.  Dal Cerro was never asked whether M.A.'s disability rendered him so incapable of caring for himself as to pose a substantial risk of serious harm to himself or others.  Instead, Dal Cerro was asked a different question about

potential harms: whether M.A. would pose a risk if he were not involuntarily medicated. Dal Cerro responded:

> Well, he's demonstrated that in his actions. He's been physically assaultive; he's been sexually transgressive; he's made impulsive decisions. Going back a couple of years [he] eluded police in his car. He had a serious motor vehicle accident. More recently, there was a bicycling accident that left injuries that he did not attend to. So I think it's sort of well documented that he poses a risk to himself and others when he's not medication compliant.

¶22 As I noted above, at least one of the events Dal Cerro describes, the motor vehicle accident, occurred over a decade ago; further, it is not clear when some of the other events may have occurred. More importantly, Dal Cerro was responding to a question about what could happen if M.A. were not involuntarily medicated, rather than what could happen if M.A. were permitted to stay in his own house. As noted, "a need for treatment does not constitute a 'primary need for residential care and custody.'" *Susan H.*, 326 Wis. 2d 246, ¶11.

¶23 While it may be true that M.A. presents a risk of harm when unmedicated, Wisconsin's statutory scheme is designed to afford persons deemed incompetent the greatest liberty consistent with protecting them and their communities from the serious harms to which they might otherwise be subject. *See* WIS. STAT. § 55.001 ("This chapter is designed … to place the least possible restriction on personal liberty and exercise of constitutional rights consistent with due process and protection from abuse, financial exploitation, neglect, and self-neglect."). One of the ways the statutes serve this end is by establishing protective services as an alternative to protective placements. *See Zander*, 87 Wis. 2d at 514 ("the court must consider the availability of treatment or protective services, and order protective placement only if it is the least restrictive alternative"). And one of the available protective services is the involuntary administration of

11

psychotropic medication. WIS. STAT. § 55.14(3). In fact, in this case, the circuit court ordered that M.A. be involuntarily medicated under this provision, and M.A. has not appealed this determination. Dal Cerro's testimony about M.A.'s actions while unmedicated seems to have provided one of the bases for the court's order for involuntary administration of psychotropic medication. But because the court's determination did not identify a "substantial risk of serious harm" to M.A. or others that would arise from M.A. living in his own house while receiving protective services, it did not provide a sufficient basis for protective placement. *See* WIS. STAT. § 55.08(c).

¶24 As noted, Dal Cerro's testimony identified a few other potential harms aside from those listed in the quotation above. He noted that M.A.'s guardian provides his meals, that M.A.'s home was "trashed," that M.A. had evidently destroyed some of his own possessions, and that he allowed "somewhat random" people into the home who had "somewhat take[n] over" his finances. As with his other testimony, this testimony was vague; it also failed to identify substantial, serious risks to M.A. or others. *See Monroe County v. H.K.B.*, No. 2024AP1305, unpublished slip op., ¶¶12-13 (WI App Jan. 16, 2025) (general testimony that subject was "not able to provide for her own needs or her own safety," "vulnerable to the influence of others which works against her best interest," and "not … able to manage without" residential care and custody was insufficient to show substantial risk of serious harm) (cited for persuasive value); *Outagamie County DHHS v. L.C.E.*, No. 2023AP929, unpublished slip op., ¶¶15, 17, 20 (WI App June 4, 2024) (testimony that apartment was "quite dirty" and subject was "vulnerable to the abuse of other people" did not amount to "a *substantial* risk of a *specific, foreseeable, and serious* harm to herself or others") (emphasis in original) (cited for persuasive value).

¶25 I further note, as the court did in *L.C.E.*, that even without a protective placement, M.A. remains subject to guardianship (by a guardian who "closely controls" his funds) and a protective services order (which authorizes M.A.'s involuntary medication). *Id.*, ¶16. Particularly in light of the supports and protections these other measures provide, the record does not sufficiently support a determination that M.A.'s condition presents a "substantial risk of serious harm" to himself or others warranting a protective placement.

## CONCLUSION

¶26 For the foregoing reasons, I reverse M.A.'s protective placement order.

*By the Court.*—Order reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.