155 Wis.2d 240 (1990)
455 N.W.2d 239
IN the MATTER OF the PROTECTIVE PLACEMENT OF D.E.R.: D.E.R., Appellant,
v.
LA CROSSE COUNTY, Respondent.
IN the MATTER OF the PROTECTIVE PLACEMENT OF M.D.A.: M.D.A., Appellant,
v.
LA CROSSE COUNTY, Respondent.
Nos. 89-0807, 89-0808.
Supreme Court of Wisconsin.
Argued January 26, 1990.
Decided May 25, 1990.
*241 For the appellants, D.E.R. and M.D.A. there were briefs (in court of appeals) by Roy W. Froemming and Wisconsin Coalition for Advocacy, Madison and oral argument by Mr. Froemming.
For the respondent there was a brief (in court of appeals) and oral argument by David L. Lange, assistant corporation counsel for La Crosse county.
Amicus curiae brief was filed (in court of appeals) by Jeffrey J. Kassel, Brady C. Williamson and LaFollette & Sinykin, Madison for the Association for Retarded Citizens, Wisconsin Chapter.
SHIRLEY S. ABRAHAMSON, J.
These appeals are from orders of the Circuit Court for La Crosse County, Peter G. Pappas, Circuit Judge. This court took these cases on petition to bypass the court of appeals. Section 808.05 and sec. (Rule) 809.60, Stats. 1987-88.
[1]
The parties have advised the court that both appeals may be moot.[1] We nevertheless proceed to decide *242 the issue raised in these appeals because, as the parties acknowledge, the issue is of public concern and likely to recur. See State ex rel. Watts v. Combined Community Services, 122 Wis. 2d 65, 70-71, 362 N.W.2d 104 (1985).
The issue we address on appeal is whether the circuit court erred in failing to order placements in the least restrictive environments (in this case community facilities) for D.E.R. and M.D.A., developmentally disabled persons, as required by sec. 55.06(9)(a), Stats. 1987-88, on the sole ground of lack of funding. The circuit court concluded that the county board of supervisors had fulfilled its statutory duty by funding protective placements with moneys the county received from the state and federal governments and with moneys the county appropriated as matching funds. We conclude that the legislature did not intend to limit the county board's duty to fund protective placements under ch. 55 to the funds the county receives in state and federal funding and the funds the county appropriates to match state funds. We vacate the orders of the circuit court and remand the causes to the circuit court for proceedings appropriate to the circumstances existing at the time of remand.
This issue arises in an unusual posture in this appeal. The circuit court neither ordered nor refused to order a change in placements for each individual. The parties and the circuit court assumed throughout the proceedings that the circuit court would have ordered a change of placements had the county been willing to fund the placements.
Instead of requesting the circuit court to order placements in the least restrictive environments for which the county claimed it had no funds, the respective guardians ad litem asked the circuit court to order the La *243 Crosse County Board of Supervisors to make funds available to the county Department of Human Services to provide D.E.R. and M.D.A. with proposed community-based protective placements, the least restrictive environments consistent with the needs of these individuals. Section 55.06(9)(a), Stats. 1987-88.
The circuit court denied the motions of the guardians ad litem, holding in both cases that secs. 51.42(3)(ar)4 and 51.437(4m)(a), Stats. 1987-88, limited the county's duty to fund protective placements to funds the county received from the state and federal governments and funds the county appropriated to match state funds. Because the circuit court concluded that the county board of supervisors had met its statutory duty in providing funds and that the county had discretion in allocating its limited resources, the circuit court refused to order the county board to provide funds for the proposed placements for these individuals. As a result of this order D.E.R. and M.D.A. remained at Northern Wisconsin Center. D.E.R. and M.D.A. appealed, and the cases were consolidated on appeal.
For purposes of this appeal we assume, as did the circuit court and the parties, that the circuit court would have ordered the proposed community care placements as the least restrictive environments but refused to do so because the county would not provide the funding. We conclude that the circuit court erred when it failed to order placements in these cases on the sole ground that the county board had fulfilled its statutory funding duty under ch. 51. Implementation of the circuit court order for protective placement in the least restrictive environments is not before us in these cases because after the appeal was taken the county provided funds for placement of these individuals. We vacate the orders of the circuit court. We remand the causes to the circuit court *244 for proceedings appropriate to the circumstances existing at the time of remand.

I.
The facts are not in dispute. When these cases arose, both D.E.R. and M.D.A. had been determined incompetent, incapable of providing for his or her own care or custody and having a permanent developmental disability. Each was committed to the Northern Wisconsin Center for the Developmentally Disabled, an institution housing more than 500 residents with developmental and related disabilities.
Pursuant to State ex rel. Watts v. Combined Community Services Board of Milwaukee Co., 122 Wis. 2d 65, 362 N.W.2d 104 (1985), the guardians ad litem for D.E.R. and M.D.A. had conducted annual reviews of the protective placements. They filed reports with the circuit court of La Crosse County concluding that for D.E.R. and M.D.A. Northern Wisconsin Center was no longer the "least restrictive environment consistent with the needs of the person to be placed," sec. 55.06(9)(a), Stats. 1987-88. In response to requests by the circuit court, the La Crosse County Department of Human Services submitted its own assessments of D.E.R. and M.D.A., and also concluded that Northern Wisconsin Center was not the least restrictive environment. The guardians ad litem and the Department recommended community placements for both individuals.
The only barrier to community placements for these individuals was funding; facilities were available in the community. Placing D.E.R. and M.D.A. in community foster care, rather than at Northern Wisconsin Center, would increase the county's financial burden because the *245 county would be forced to assume a larger percentage of the total costs of the placement.
The cost of care at Northern Wisconsin Center (averaged across all the clients) was $143 per day at the time of the hearing in the circuit court, and this cost was paid entirely by funds from the state and federal governments. Community foster care placement, by contrast, would be about $116 per day for D.E.R. and between $166 and $206 per day for M.D.A. State and federal funds would pay about $98 per day for each individual, leaving a funding gap of about $18 per day for D.E.R. and $68 per day for M.D.A. that the county would have to assume. The Department claimed that although it had made considerable efforts to locate county funding for community placement for the two individuals, no county funds were available to implement the proposed community placements. This claim is not challenged.
The county does not object to the daily cost of the proposed placements or assert that the costs are exorbitant or unreasonable as compared with the benefit to each individual.[2] The costs for community care are comparable to the costs of caring for the individuals at Northern Wisconsin Center. The sole basis for the county's argument against the proposed community placements in the least restrictive environments is that the county has already committed all available funds to existing programs. The county asserts that if it allocated additional funding for D.E.R. and M.D.A. it would not be able to meet the needs of others.
The parties agree that La Crosse County provides matching funds for human services and indeed appropriates substantial funds annually for human services over *246 and above the required county matching funds. The parties also agree that about twelve individuals in La Crosse County are, like D.E.R. and M.D.A., protectively placed in overly restrictive environments and are on waiting lists for community alternatives.
We turn now to the legal issue presented by these undisputed facts.

II.
The issue on appeal is whether the circuit court erred in refusing to order placements in the least restrictive environments under sec. 55.06(9)(a)[3] on the sole ground that the county had fulfilled its statutory duty by funding protective placements with moneys the county receives from the federal and state governments and with moneys the county appropriates as matching funds. As we discussed previously, the circuit court concluded that the county board of supervisors did not have a statutory duty to provide funds for the placements in question over and above the funds available to the Department from state and federal funding and designated county matching funds.
*247 The county argues on appeal that the statutes require the circuit court to consider available funds in ordering placements. The county relies exclusively on sec. 55.001, the legislative declaration of policy in ch. 55, which states that the protective services "should, to the maximum degree of feasibility, allow the individual the same rights as other citizens and at the same time protect the individual from exploitation, abuse and degrading treatment" (emphasis added).[4] The Department asserts that sec. 55.001 means that practical financial considerations limit the circuit court's discretion to order placement in the least restrictive environment.
We are not persuaded that the Department's interpretation of sec. 55.001 is correct. The phrase "to the *248 maximum degree of feasibility" is not defined or explained in the statutes. The word feasibility appears to be used in its ordinary meaning"possibility of realization." On examining sec. 55.001 in the context of ch. 55, we read sec. 55.001 as meaning that the individual is entitled to be placed in the least restrictive environment consistent with his or her needs as a developmentally disabled person and that the right to placement is not limited by funds available from the state and federal governments and matching county funds. We cannot find a legislative statement in sec. 55.001 or any other provision in ch. 55 that requires the circuit court to consider the availability and source of funds when placing an individual in the least restrictive environment.
Several provisions in ch. 55 support our interpretation of sec. 55.001. Section 55.06(9)(a) provides that the circuit court shall order placement on the basis of the evaluation and other relevant evidence, and placement "shall be made in the least restrictive environment consistent with the needs of the person to be placed." The factors enumerated in sec. 55.06 for consideration in making protective placement, although not all inclusive, relate to the individual onlythe needs of the person to be protected and the level of supervisionand do not refer to appropriations by the county board of supervisors.
Moreover sec. 55.07 expressly grants a person under protective placement the rights provided by sec. 51.61.[5] Section 51.61(1)(e) ensures each person under protective placement the right to the least restrictive conditions *249 necessary to achieve the purposes of placement.[6] Section 51.61(1)(f) further provides that each person under protective placement has the right to receive prompt and adequate treatment, rehabilitation, and educational services appropriate to his or her condition.[7] The rights under sec. 51.61(1) are not advisory or discretionary. Section 51.61(7) specifically provides for a right of action to enjoin a violation or denial of those rights enumerated in the statute.[8]
Our interpretation of sec. 55.001 comports with prior decisions addressing the rights of the developmentally disabled. In Watts, supra 122 Wis. 2d at 78, the court concluded that judicial review would protect the individual from placement decisions being made on the basis of the county's financial considerations.[9]
*250 Our reading of sec. 55.001 reaffirms the legislative policy underlying ch. 55. The legislature has declared the policy of this state to include the developmentally disabled in the community and to offer special services they need to develop and grow. These services should foster the potential of developmentally disabled individuals by protecting them while affording them the maximum freedoms possible.
The parties agree that the proposed community placements are the least restrictive environments consistent with the needs of the developmentally disabled. We therefore conclude that the proposed placements are feasible within the meaning of sec. 55.001.
The county argues in the alternative that the funding constraints under ch. 51, Stats. 1987-88, apply with equal force to protective placements made pursuant to ch. 55. The county contends that it may limit its responsibility for protective placements under ch. 55 to available state and federal funds and county matching funds.
Section 51.42(3)(ar)4 provides that the county Department of Human Services[10] shall "within the limits of available state and federal funds and of county funds appropriated to match state funds, provide [enumerated services] for the program needs of persons suffering from mental disabilities, including . . . developmental disabilities . . .." Section 51.437(4m)(a) provides that a county Department of Human Services[11] shall *251 "within the limits of available state and federal funds and of county funds appropriate to match state funds, establish a county developmental disabilities services program."[12]
The county acknowledges that neither ch. 51 nor ch. 55 expressly applies the ch. 51 funding limitations to ch. 55 protective placements. The county justifies application of ch. 51's funding limitations to ch. 55 protective placements on two grounds.
First, the county contends that persons who meet the standards for protective placement under sec. 55.06 should be considered a subset of the broader group of persons receiving mental health services under the jurisdiction of the county department of social services. Because the two chapters relate to the same people, argues the county, the two chapters should be construed together to limit the county's funding responsibility for placements under chs. 51 and 55 to securing all available state and federal funding and to providing county funds appropriate to match state funds.
*252 Second, the county argues that the statutes authorize the county Department of Human Services to adopt, with regard to services provided under ch. 51, specific priorities and coordinate local services to reflect the reality of limited or fluctuating financial resources.[13] It follows, according to the county, that it must be able to balance, within financial constraints, the needs of individuals committed under ch. 55 with the needs of others receiving Mental health services under ch. 51.
Upon review of the statutes and the underlying purposes of chs. 51 and 55, we conclude that the guardians ad litem present the more compelling argument.
We agree with their contention that the funding limitations established by ch. 51 do not affect people who are confined by protective placement orders of the circuit court under sec. 55.06. Section 55.06(13) provides in part that "the appropriate board [in the county] shall be charged for the costs of care and custody resulting from placement" under sec. 55.06.[14] Section 55.06(13) leaves no room for the county to refuse to pay for a court-ordered placement on the sole ground that the county's funding obligations are limited to funds available from state and federal funding and county matching funds.
The legislature has not expressly limited the county's responsibility in ch. 55 to make placements to the least restrictive environment to funds available from state or federal sources and county matching funds. Nothing in ch. 55 indicates that the funding limitations of secs. 51.42 and 51.437 apply to protective placements under sec. 55.06.
*253 Furthermore, chs. 51 and 55 do not cover precisely the same segment of the population. With the passage of ch. 55, the legislature established a separate statutory system for persons under protective placement. The legislature recognized the unique needs of individuals with permanent developmental disabilities and created a system for preventing their abuse, neglect, and exploitation. Under sec. 55.06(2), persons subject to court-ordered protective placement include people with infirmities of aging who could not be served under ch. 51. See sec. 51.01(3g). Sections 51.42 and 51.437 (people in need of services due to mental illness, developmental disabilities or substance abuse as defined in sec. 51.01) include many persons not in need of involuntary, protective residential placement under the standards of sec. 55.06(2).
[2]
We conclude that the state legislature has committed itself and the counties to providing protective placements that meet the standard of sec. 55.06(9)(a) and do not violate the rights guaranteed by sec. 51.61. The circuit court erred when it refused to order placement in the least restrictive environment on the sole ground that the county's duty is limited to the funds available from state and federal funding and county matching funds.
This case does not pose the question of whether the circuit court may ever consider the costs of the proposed placement. Counsel for D.E.R. and M.D.A. acknowledged at oral argument that there may be cases in which the costs of the proposed placement are so exorbitant and the benefits to the individual so minimal that it is not reasonable for a professional to recommend the placement or for a circuit court to order such a placement.
We recognize that the county and its taxpayers may suffer a significant financial burden when, as in the present *254 case, the state mandates county action and fails to provide funds adequate to carry out that mandate. County supervisors may have difficulty complying with state mandates and at the same time effectively controlling taxes because of the costs created by state mandated programs. The counties must, however, look to the legislature, not the courts, for relief when the fiscal burdens created by legislative mandates become onerous.
For some time, Wisconsin has abandoned attempts to isolate persons with disabilities from the community. A. Rugg, Children of Misfortune: One Hundred Years of Public Care for People with Mental Retardation in Wisconsin, 1871-1971 (1984). Recognizing the unique talents, special needs and human rights of the disabled, the legislature sought to integrate disabled individuals into the community by providing services in the least restrictive environment that is feasible with the needs of the individual. The New Jersey Supreme Court eloquently expressed the concerns of the New Jersey legislature which are also the concerns of our legislatureas follows:
Like all other individuals, the mentally retarded have the right to pursue happiness. Unlike other citizens, they have unique hurdles to overcome in doing so. Rather than exclude them from the pursuit of happiness, the Legislature has made an effort to include them in our civic community by providing them the special services they need to develop and grow. This public policy affirms our common humanity. Their concerns are our concerns. In this State, we do not set people adrift because they are the victims of misfortune. New Jersey Ass'n for Retarded Citizens, Inc. v. New Jersey Dept. of Human Services, 89 N.J. 234, 445 A.2d 704, 713 (1982).
*255 In Wisconsin, the legislature has committed itself and the counties to providing protective placements that meet the standard of sec. 55.06(9)(a) and do not violate the rights guaranteed under sec. 51.61. We conclude that the legislature did not intend to limit the county board's duty to fund protective placements in the least restrictive environment under ch. 55 to the funds the county receives in state and federal funding and the funds the county appropriates in matching funds.
For the reasons set forth we remand the cases to the circuit court for proceedings appropriate at the time of remand.
By the Court.The orders of the circuit court are vacated and the causes remanded.
NOTES
[1] After the appeal, the county allotted funds to place both individuals in community settings. A disagreement apparently arose after the appeal about the appropriate placement of one of the individuals.
[2] Although the question was raised in the circuit court of whether D.E.R. would benefit from a less restrictive placement, the issue was not argued before the circuit court.
[3] The pertinent language of sec. 55.06(9)(a) is as follows:

[T]he court, on the basis of the evaluation and other relevant evidence shall order placement through the appropriate board designated under § 55.02. . . . Placement shall be made in the least restrictive environment consistent with the needs of the person to be placed. Factors to be considered in making protective placement shall include the needs of the person to be protected for health, social or rehabilitative services and the level of supervision needed . . .. Placements may be made to such facilities as nursing homes, public medical institutions, centers for the developmentally disabled under the requirements of § 51.06(3), foster care services and other home placements, or to other appropriate facilities . . ..
[4] Section 55.001, the chapter's "Declaration of Policy" reads as follows:

The legislature recognizes that many citizens of the state, because of the infirmities of aging, chronic mental illness, mental retardation, other developmental disabilities or like incapacities incurred at any age, are in need of protective services. These services should, to the maximum degree of feasibility, allow the individual the same rights as other citizens, and at the same time protect the individual from exploitation, abuse, and degrading treatment. This chapter is designed to establish those services and assure their availability to all persons when in need of them, and to place the least possible restriction on personal liberty and exercise of constitutional rights consistent with due process and protection from abuse, exploitation and neglect.
Counsel for both sides use the terms protective placement and protective services interchangeably. The statutes appear to make a distinction. See sec. 55.04(1)(a). Protective services may be available without court involvement, as provided by sec. 55.05(5). In contrast, "protective placements" involve the court and are governed by sec. 55.06. If both services and placements are included within the phrase "Protective Service System," we must presume that the legislature meant to include protective placements in applying the term services generally in sec. 55.001.
[5] Section 55.07 provides: "The rights and limitations upon rights, procedures for enforcement of rights and penalties prescribed in sec. 51.61 apply to persons who receive services under this chapter . . .."
[6] Section 51.61(1)(e) provides that persons receiving services for developmental disabilities "have the right to the least restrictive conditions necessary to achieve the purposes of admission, commitment or placement. . .."
[7] Section 51.61(1)(f) provides that the patients "have a right to receive prompt and adequate treatment, rehabilitation and educational services appropriate to his or her condition."
[8] Section 51.61(7) provides that any person whose rights are protected under sec. 51.61 has a right to bring an action and provides for recovery of damages.
[9] placed individuals would greatly benefit from an impartial judicial review of their records. In many situations, the department of health & social services or the responsible protective services agency may be influenced in its decision making by the economics of the placement. If the person remains in the nursing home, this is cost free to the county. If the person is in a county operated nursing home, there may be pressure not to remove a person due to possible loss of revenue for the facility. If the person is sent from a nursing home, there may be a necessity for the state and county to purchase community services. None of these complications and potential conflicts are presently required to be reviewed by an impartial judicial officer to determine the advisability and permissibility of the continuation of the protective placement originally made by the court. State ex rel. Watts v. Combined Community Services, 122 Wis. 2d 65, 78, 362 N.W.2d 104 (1984).
[10] Section 51.42(3)(ar) refers to a county department of community programs but under sec. 46.23(3)(b)2a the statute applies to the county board of human services.
[11] Section 51.437(4m)(a) refers to a county department of developmental disabilities services but under sec. 46.23(3)(b)2a the statute applies to the county board of human services.
[12] See also sec. 46.22(1)(b)7 stating that the county department of social services (the county Department of Human Services under sec. 46.23(3)(b)2a) shall have the power, duties and functions to provide social services for certain people "within the limits of available federal and state funds and county funds appropriated to match state funds;" sec. 51.42(3)(aw)1. stating that a county department of community programs (the county Department of Human Services under sec. 46.23(3)(b)2a) may offer certain services to provide for the program needs of persons suffering from mental disabilities including developmental disability "within the limits of stats and county appropriations and maximum available funding from other sources;" secs. 51.42(3)(aw)2. and 51.437(4r)(b) recognize that the county department of human resources "may allocate services among service recipients to reflect the availability of limited resources."
[13] See, e.g., secs. 46.22(2)(f) and 51.42(3)(ar)5, Stats. 1987-88.
[14] The parties apparently disagree whether the board referred to in sec. 55.06(13) is the county board of supervisors or the county Department of Human Services.