IN the MATTER OF J.G.S., Jr., Incompetent. FOND
DU LAC COUNTY, Appellant,

v.

J.G.S., Jr., Respondent.

Court of Appeals

*No. 89-0309. Submitted on briefs November 19, 1990.—Decided
December 12, 1990.*

(Also reported in 465 N.W.2d 227.)

On behalf of the appellant, the cause was submitted on the briefs of *Thomas L. Storm,* Fond du Lac County Corporation Counsel.

*See Callaghan's Wisconsin Digest, same topic and section number.

On behalf of the respondent, the cause was submitted on the brief of *Roy Froemming,* The Wisconsin Coalition for Advocacy.

On behalf of the guardian ad litem, the cause was submitted on the brief of *Nicholas A. Casper* of *Donohue, Donohue, Sharpe & Casper, S.C.* of Fond du Lac.

On behalf of the Association for Retarded Citizens (Wisconsin Chapter), there was an amicus curiae brief by *Jeffrey J. Kassel* and *Brady C. Williamson* of *LaFollette & Sinykin* of Madison.

Before Nettesheim, P.J., Brown and Scott, JJ.

BROWN, J.   This case concerns the "least restrictive placement" for a developmentally disabled man, which placement the circuit court determined to be a community placement that neither then nor now exists. The county pleads lack of available funds. We follow our supreme court's decision in *In re D.E.R. v. La Crosse County,* 155 Wis. 2d 240, 455 N.W.2d 239 (1990). In that case, the court held that a county's statutory obligation to place developmentally disabled individuals in the least restrictive environment is not limited by the availability of appropriated funds. *Id.* at 253, 455 N.W.2d at 245. We hold that even though D.E.R. involved a community placement that already existed, and this case does not, *D.E.R.* still controls. We affirm.

Preliminary to discussion of the major issue, we discuss the other issue raised by the county which regards the trial court's finding that a community living arrangement is the least restrictive placement consistent with J.G.S., Jr.'s needs. The county claims that the finding is clearly erroneous. An appellate court will search the record for evidence to support the trial court's findings of fact. *See In re Estate of Becker,* 76 Wis. 2d 336, 347,

251 N.W.2d 431, 435 (1977). Findings of fact shall not be set aside unless clearly erroneous. Section 805.17(2), Stats. We review the facts with these standards in mind.

J.G.S., Jr. was twenty-four years old at the time of the circuit court decision. He is deaf, blind and mentally retarded. He was protectively placed at Central Wisconsin Center for the Developmentally Disabled (CWC) in April, 1985 by the Fond du Lac County Circuit Court. The circuit court eventually issued an order after a review required by *State ex rel. Watts v. Combined Community Servs. Bd.*, 122 Wis. 2d 65, 362 N.W.2d 104 (1985). The order resulted from a finding that CWC was not the least restrictive placement consistent with J.G.S., Jr.'s needs. The circuit court then found that an appropriate community living arrangement was the least restrictive placement. There is credible evidence to uphold the finding.

J.G.S., Jr. exhibits a relatively high level of functioning when compared to others with similar disabilities. He displays good gross and fine motor skills. He benefits both from family involvement and outside leisure activities. He has been exposed to an apartment-type setting at CWC to which he adapted and apparently enjoyed. He is able to pick out his own clothes and dress and undress himself independently. He eats independently and can serve himself foods and pour liquids. He finds his way around familiar environments by "trailing," i.e., following walls and stairways to his destination. He learns new places and routines within a few weeks. At work, he independently finds his own locker and proceeds to the room where his first job is located. He requires no assistance.

He communicates through tactile sign language. He can express himself through approximately fifty signs and understands about eighty-three signs. He can under-

stand and follow two- to three-part commands within the routine of a day.

He is a social person. He enjoys conversing through signs, responds positively to affection and initiates contact with others. He distinguishes between environments and enjoys going out into the community. He does not present behavioral difficulties in community settings. He has greater adaptive skills than 97% of CWC residents. There is strong evidence that he is capable of learning and growth.

The staff who work with J.G.S., Jr. at CWC recommended community placement for him. This recommendation has only occurred with four of the fifty-eight residents in the unit. It was made in this case after observing the successful community placement of three people in his unit with similar or greater support needs.

Professor Joe Reichle of the University of Minnesota, who has been consulted to provide technical assistance to services for people who are deaf and blind under a national grant, evaluated J.G.S., Jr. He found that community placement was feasible. So did Elise Long, J.G.S., Jr.'s vocational teacher, who has herself provided technical assistance under the national deaf-blind grant.

CWC is a difficult environment for J.G.S., Jr. to use his "trailing" skills. A community living arrangement would allow for natural access to community resources for walks, shopping and the like. It would also provide greater access to his family and the opportunity to develop new personal relationships. While CWC provides few opportunities for choices in terms of activities, schedule and choice of food, the community living arrangement would let J.G.S., Jr. take greater control over his life, allowing him to develop communication and problem-solving skills. One witness testified that J.G.S., Jr. has nothing more to gain at CWC and might

in fact lose the skills gained for lack of opportunity to use them. A two-person placement was recommended. Another person from a different county was prepared to enter into this arrangement. All of these facts are credible and support the circuit court's decision.

■

While it is true that there was testimony by county witnesses which might produce a contrary inference, the circuit court considered this evidence but rejected it after opining that the testimony evinced more of a concern about the financial cost to the county than about whether J.G.S., Jr. was a candidate for community placement. There is nothing in the record to refute that and we abide by the circuit court's determination.

Having decided that the circuit court's finding concerning J.G.S., Jr.'s needs being met by a community living arrangement is not clearly erroneous, we move to the major issue—whether the statutes contemplate that a county can be forced to create a community living arrangement where none presently exists.

Prior to the supreme court's decision in *D.E.R.,* the county argued that the feasibility of a placement is dependent on the county's discretionary decision to allocate resources. *D.E.R.* rejected this argument. The court wrote:

> In Wisconsin, the legislature has committed itself and the counties to providing protective placements that meet the standard of sec. 55.06(9)(a) and do not violate the rights guaranteed under sec. 51.61. We conclude that the legislature did not intend to limit the county board's duty to fund protective placements in the least restrictive environment under ch. 55 to the funds the county receives in state and federal funding and the funds the county appropriates in matching funds.

690

*D.E.R.,* 155 Wis. 2d at 255, 455 N.W.2d at 246. The county concedes that its initial argument, made to this court before *D.E.R.* was decided, has now been rejected by the supreme court. However, the county now points to other language in the opinion that it claims provides an exception to the holding. The court stated:

> This case does not pose the question of whether the circuit court may ever consider the costs of the proposed placement. Counsel for D.E.R. and M.D.A. acknowledged at oral argument that there may be cases in which the costs of the proposed placement are so exorbitant and the benefits to the individual so minimal that it is not reasonable for a professional to recommend the placement or for a circuit court to order such a placement.

*Id.* at 253, 455 N.W.2d at 245. The county argues that the costs are exorbitant in light of the benefits for J.G.S., Jr. It cites a potential annual cost of $99,946. It further points out that J.G.S., Jr. had previously been placed in a community setting but the placement did not work out due to lack of adequate staffing. The county argues that because no facility exists in the community with which to provide for J.G.S., Jr., a separate institution would have to be created. The county therefore contends that · the costs greatly exceed the minimal benefit.

We have two responses. First, while the *D.E.R.* decision does not directly address whether a placement must be in existence in order to be considered feasible, the definition of "feasibility" adopted by the court with regard to the funding issue is equally applicable to the question of the location and development of an appropriate placement. The supreme court determined that:

> The word *feasibility* appears to be used in its ordinary meaning—"possibility of realization." . . . [W]e read sec. 55.001 as meaning that the individual is entitled to be placed in the least restrictive environment consistent with his or her needs as a developmentally disabled person and that the right to placement is not limited by funds available from the state and federal governments and matching county funds. We cannot find a legislative statement in sec. 55.001 or any other provision in ch. 55 that requires the circuit court to consider the availability and source of funds when placing an individual in the least restrictive environment.

*Id.* at 248, 455 N.W.2d at 243 (emphasis in the original). We construe the court's statement to mean that nonexistence of a facility is alone immaterial to whether the person is entitled to be placed in the least restrictive setting posited by the evidence. Rather, each case stands or falls on its own facts.

Our second response is that the facts belie the county's contention that a "separate institution" will have to be created to carry out the mandate of the circuit court. As pointed out by amicus curiae, Association for Retarded Citizens (Wisconsin Chapter), the county is not being asked to build a facility. To the contrary, there is no particular requirement for the physical setting in which J.G.S., Jr. should live, other than that it be a typical home or apartment located near community resources.

As observed by amicus, the county is simply being asked to develop a plan of individual support *services* to meet J.G.S., Jr.'s needs. Several community service agencies have indicated their willingness to offer the support services necessary to develop a service plan.

Thus, the plan is in keeping with the accepted practice of designing residential services around individual support needs. *See* S. Taylor, J. Racino, J. Knoll & Z. Luttiya, *The Nonrestrictive Environment: On Community Integration for People with the Most Severe Disabilities* 12–13 (1987). The county's position that the "facility" exist before the decision is made to move an individual to a community setting would impair this approach. To adopt the county's position would mean that a specific foster home, home or apartment with appropriate services would already have to be identified. That seems contrary to the idea of a feasible individualized package of support services designed to meet the developmentally disabled person's needs. It would also allow a county to shirk its responsibility by failing to plan for small community living arrangements, thus preventing such plans from ever "existing." We conclude that a court can require the placement agency to do the planning and implementation work needed to carry out its obligation to order placements in conformity with secs. 51.61(1)(e) and 55.06(9)(a), Stats.

In this case, the evidence is that the county's cost estimate of almost $100,000 was based on a two-person program which results in a per-person cost of $137 a day. Placement at CWC costs the county $148 per day. We conclude that the costs of this individualized placement are not exorbitant. We affirm the order of the circuit court.

*By the Court.*—Order affirmed.