COURT OF APPEALS
DECISION
DATED AND FILED

August 18, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.   **2022AP229**

STATE OF WISCONSIN

Cir. Ct. No.  2013GN2P

IN COURT OF APPEALS
DISTRICT IV

---

IN THE MATTER OF THE GUARDIANSHIP AND
PROTECTIVE PLACEMENT OF R.D.S.:

CLARK COUNTY,

   PETITIONER-RESPONDENT,

 V.

R. D. S.,

   RESPONDENT-APPELLANT.

---

APPEAL from order of the circuit court for Clark County: LYNDSEY BRUNETTE, Judge. *Reversed and cause remanded with directions*.

¶1     KLOPPENBURG, J.[1] R.D.S. appeals the circuit court's order continuing his protective placement in a group home pursuant to Wis. Stat. § 55.08(1).  R.D.S. argues that:  (1) the circuit court improperly shifted the burden of proof; and (2) there was insufficient evidence presented at the hearing to support a continuation of R.D.S's protective placement.  As explained below, the record establishes that Clark County Community Services (the County) failed to prove by clear and convincing evidence that the standards for continuing protective placement were met.[2]  Accordingly, I reverse the order continuing R.D.S.'s protective placement.

¶2     R.D.S. requests that, if this court reverses the order for continued protective placement, the court "remand this matter to the circuit court with directions to enter an order allowing R.D.S. to live with his parents, with protective services."  The County does not respond to R.D.S.'s request or otherwise address the remedy in the event of reversal, which I deem as a concession that R.D.S.'s requested remedy is appropriate.  *See Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994) (explaining that "[t]his

---

[1] This case initially involved both a petition for permanent guardianship under Wis. Stat. ch. 54 and a petition for protective placement under Wis. Stat. ch. 55.  Because this appeal involves only the protective placement order, it is decided by one judge pursuant to Wis. Stat. § 752.31(2)(d) (2019-20).  *See Waukesha County v. Genevieve M.*, 2009 WI App 173, ¶5, 322 Wis. 2d 131, 776 N.W.2d 640 (per curiam) ("appeals which involve only a protective placement order … will be assigned for decision by one court of appeals judge.").

The parties completed briefing of this appeal on July 8, 2022.

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] Because this conclusion is dispositive, I do not address R.D.S.'s burden-shifting argument.  *See Barrows v. American Family Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

court has held that respondents cannot complain if propositions of appellants are taken as confessed which respondents do not undertake to refute"). Accordingly, I also remand to the circuit court with directions to enter an order allowing R.D.S. to live with his parents, with protective services.[3]

## BACKGROUND

¶3 R.D.S. was first placed in a group home pursuant to an order for protective placement in 2013, and since then he has lived in that group home pursuant to orders continuing his protective placement. In May 2021, the County filed a petition for an annual review of the status of R.D.S.'s protective placement.

¶4 The circuit court held a *Watts*[4] hearing in August 2021. Three witnesses testified at the hearing: the psychologist who examined R.D.S. before the hearing (whose report was also entered into evidence), the assistant manager of the group home where R.D.S. is protectively placed, and R.D.S. Their testimony is described in detail blow. After the close of evidence, the County argued that R.D.S.'s protective placement be continued, R.D.S.'s counsel argued that the County failed to meet its burden of showing that the standards for continuing

---

[3] The parties do not argue, and it does not appear from the record, that the order being reversed has expired. Accordingly, the requested remedy of reversal and remand with directions is not precluded by our supreme court's recent ruling that, with respect to a recommitment order under WIS. STAT. ch. 51, if the order being reversed has expired, "the circuit court lacks competency to conduct any proceedings on remand. Therefore, reversal is the appropriate remedy in this case." *Matter of Commitment of M.W.*, 2022 WI 40, ¶4, 402 Wis. 2d 1, 974 N.W.2d 733.

[4] *State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.*, 122 Wis. 2d 65, 362 N.W.2d 104 (1985) (requiring an annual review of the necessity of a hearing and, if necessary, a "full due process hearing" on the need for continued protective placement).

protective placement were met, and the guardian ad litem recommended that the court order protective services in lieu of protective placement.

¶5      The circuit court granted the County's petition for continued protective placement of R.D.S., and this appeal followed.

## DISCUSSION

¶6      Decisions on protective placement are within the sound discretion of the circuit court. *Anna S. v. Diana M.*, 2004 WI App 45, ¶7, 270 Wis. 2d 411, 678 N.W.2d 285.  "The circuit court's factual findings will not be overturned unless clearly erroneous." *Coston v. Joseph P.*, 222 Wis. 2d 1, 22, 586 N.W.2d 52, 61 (Ct. App. 1998); *see* WIS. STAT. § 805.01(2).  The issue of whether the evidence satisfies the legal standard for protective placement is a question of law that we review de novo. *Coston*, 222 Wis. 2d 23.

¶7      Before a circuit court can order the protective placement of an individual, it must find by clear and convincing evidence that the individual meets all four standards in WIS. STAT. § 55.08(1).  WIS. STAT. § 55.10(4)(d).  Those standards are as follows:

> (a) The individual has a primary need for residential care and custody.

> (b) The individual is a minor who is not alleged to have a developmental disability and on whose behalf a petition for guardianship has been submitted, or is an adult who has been determined to be incompetent by a circuit court.

> (c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or

herself or others.  Serious harm may be evidenced by overt acts or acts of omission.

(d)  The individual has a disability that is permanent or likely to be permanent.

Sec. 55.08(1).

¶8      Here, R.D.S. challenges only whether the third standard, WIS. STAT. § 55.08(1)(c), was proven by clear and convincing evidence.  Specifically, R.D.S. argues that the County failed to present sufficient evidence to show that his mental illness has resulted in his being "so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others."  WIS. STAT. § 55.08(1)(c).

¶9      At the August 2021 hearing, the County's expert witness, licensed psychologist Dr. Michael Lace, testified that, in preparation for the hearing, Lace met with R.D.S. by telephone for approximately forty-five minutes and reviewed R.D.S.'s most recent evaluation in 2018.  Lace also prepared a report that was entered into evidence.

¶10     Lace testified that his main concern is R.D.S.'s limited "insight and judgment" in terms of his denying that he has any mental health-related issues and his not knowing what medications he is taking.  Lace opined that, based on R.D.S.'s lack of awareness of both his mental illness and his medications, without 24-hour supervision, R.D.S. would not likely comply with his medications and treatment, and he would likely "decompensate and perhaps end up in the hospital" and become "more paranoid, and have a recurrence of []similar symptoms."  Lace testified that R.D.S. made no specific comments indicating that he does not want to take his medications or would not take them without supervision, nor did Lace see any specific instances in the record of any issue with R.D.S. not taking his

medications. Lace testified that he believes that "residential care and custody … would be the best fit" in order to help R.D.S. with "medication management," but also that protective services could be appropriate "if someone is working closely with him." Lace testified that there would be safety issues if R.D.S. "was completely cut off from services … and didn't have any protective services at the very least."

¶11 Also at the August 2021 hearing, Riley Meyers, assistant manager at the group home where R.D.S. is protectively placed, testified that R.D.S. prepares a sandwich for his breakfast and that the group home staff cook R.D.S.'s other meals, prompt him to shower more than once a week, and administer his medications. Meyers testified that she has not seen R.D.S. cook meals but that he could if he was willing to learn, though he might forget to turn off the oven; that he has no personal hygiene issues other than not showering more than once a week; and that he is generally compliant with taking his medications and could potentially learn to manage his own medications. Meyers testified that she is aware of no inappropriate behaviors during R.D.S.'s visits with his parents at their home.

¶12 As the third witness at the August 2021 hearing, R.D.S. testified that he wants the circuit court to discontinue his protective placement and that he would go live with his parents. He testified that he lives at his parents' home one week each month, and that when he is there he takes his medication in labeled packets. He testified that, if he went to his parents' home he would take all the medications he is prescribed, even though he believes that he does not need them, and that he would not oppose the court ordering that someone come to his parents' home and make sure that he is taking his medications every day. He testified that he used to cook meals for the group home residents, that he showers twice a week

and does not need to be prompted, and that he takes his medications without being prompted.

¶13    The evidence presented at the hearing and credited by the circuit court identified the following three concerns with not continuing R.D.S.'s protective placement at the group home:  (1) medication management, given his lack of awareness of either his mental illness or the medications he takes to address his mental illness; (2) showering; and (3) meal preparation.

¶14    As to (1), the psychologist testified that, if R.D.S. did not properly take his medication, he could decompensate, become more paranoid, and need to be hospitalized.  However, there was no evidence that R.D.S. was not compliant with taking his medication, or that he did not properly do so when he lived with his parents for one week each month.  Nor was there evidence as to whether, and how, by "decompensating" and becoming "more paranoid," R.D.S. would be at substantial risk of endangering himself or others.  As to (2), the group home assistant manager testified that R.D.S. showered unprompted no more than once a week.  However, there was no evidence that his doing so caused any hygiene problem.  As to (3), the assistant manager testified that R.D.S. did not prepare his meals other than a sandwich for breakfast, and that while he could learn to cook he might forget to turn off the oven.  However, there was no evidence of his being forgetful or of his not eating properly when he lived with his parents for one week each month.  This evidence was not sufficient to meet the County's burden to prove by clear and convincing evidence that, due to his mental illness, R.D.S. was "so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others."  WIS. STAT. § 55.08(1)(c).

¶15    The County's arguments to the contrary are unavailing. The County argues that R.D.S.'s testimony about properly taking his medication and caring for himself while at his parents' home is uncorroborated. However, this argument is refuted by the record. The psychologist testified that there is no indication of medication management issues in the record that he reviewed, and the group home assistant manager testified that there is no indication of inappropriate behaviors by R.D.S. while at his parents' home.

¶16    The County argues that R.D.S.'s testimony about an old, undisputed multi-million dollar judgment in favor of his prior business constitutes a "preoccupation" that is a "symptom of his longstanding impairments relating to his mental illness." However, the County does not explain how this "preoccupation" shows a substantial risk of danger to R.D.S. or others.

¶17    The County argues that the circuit court found the group home assistant manager's testimony more credible than R.D.S.'s as to his showering no more than once per week. However, as stated, the County points to no evidence that such a practice poses any risk of danger to R.D.S. The County asserts that the assistant manager testified that R.S.D. needed to be prompted to shower even once per week. This assertion misrepresents her testimony. She testified that he "just wants to [shower] once a week" and group home staff prompt him "to take *more* showers during the week."

¶18    The County argues that the circuit court properly weighed the evidence as to whether R.D.S. is incapable of providing for his own care or custody. However, as explained, there is little if any evidence showing that R.D.S. is so incapable as to be at substantial risk of endangering himself; the testimony described above does not constitute clear and convincing evidence to that effect.

¶19     The County argues that the evidence of R.D.S.'s unwillingness to perform activities of daily living reflects his mental illness and proves his inability to do so.  However, while it may reflect R.D.S.'s mental illness, there is no evidence that R.D.S. is unwilling to or does not perform the activities identified as concerns so as to risk his health and safety.  That is, there is no evidence that he is not compliant with taking his medication, either at the group home or at his parents' home; there is no evidence that his showering no more than once per week endangers him; and there is no evidence that he does not eat properly when away from the group home at his parents' home.

¶20     The County argues that it is sufficient that the psychologist testified that R.D.S.'s unawareness of his mental illness and medication needs means that, if he were not protectively placed, there is a risk that he could endanger himself by not properly taking his medications.  However, as explained above, the psychologist did not specify what danger would ensue from R.D.S's improperly managing his medications, and could not identify any indication that R.D.S. had been or indicated he would be noncompliant with taking his medications.

¶21     In sum, the County fails to show that it presented sufficient evidence to meet its burden of proving, by clear and convincing evidence, that the dangerousness standard in WIS. STAT. § 55.08(1)(c) was met.

## CONCLUSION

¶22     For the reasons stated, the August 2021 order for protective placement is reversed, and this case is remanded to the circuit court with directions to enter an order allowing R.D.S. to live with his parents, with protective services.

*By the Court.*—Order reversed and cause remanded with directions.

This opinion will not be published. *See* W<small>IS</small>. S<small>TAT</small>. R<small>ULE</small> 809.23(1)(b)4.