**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 9, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP1461**

**STATE OF WISCONSIN**

Cir. Ct. No. 2021GN501

**IN COURT OF APPEALS
DISTRICT I**

IN THE MATTER OF THE GUARDIANSHIP AND PROTECTIVE PLACEMENT OF S.L.H.-K.:

MY CHOICE WISCONSIN,

     PETITIONER-RESPONDENT,

  V.

S.L.H.-K.,

     RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Milwaukee County: PAUL R. VAN GRUNSVEN, Judge. *Reversed and cause remanded with directions.*

Before White, C.J., Donald, P.J., and Geenen, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Sarah[1] appeals circuit court orders granting My Choice Wisconsin's petitions for guardianship and protective placement.  On appeal, Sarah contends that her power of attorney for healthcare ("HPOA") rendered a guardianship unnecessary, and thus, the petitions for guardianship and protective placement should be dismissed.  For the reasons set forth below, we agree and reverse.

## BACKGROUND

¶2     Fifty-three-year-old Sarah has been diagnosed with neurocognitive disorder and paranoid schizophrenia, and demonstrates severe levels of cognitive, academic, social, and functional impairments.[2]

¶3     On May 19, 2021, Sarah signed an HPOA.  The HPOA named her grandmother, D.K., as her primary health care agent, and her mother, C.K., as her alternate health care agent.  In July 2021, the HPOA was activated based on a certification of incapacity signed by Dr. Michael Kula and Michelene C. Larrabee, a certified physician assistant.

¶4     On December 9, 2021, Nina Gelfand, Sarah's nurse case manager, filed a petition for guardianship and a petition for protective placement on behalf

---

[1] For ease of reading, in lieu of using the initials S.L.K.-H., we use the pseudonym "Sarah."

[2] Sarah also has a history of cocaine abuse and cocaine dependence with cocaine-induced anxiety disorder.

of My Choice Wisconsin, which provides family care services. The petitions acknowledged that Sarah had an activated HPOA, but asserted that her "[H]POA agents are not available to the extent needed; proposed ward requires heightened decision[-]making support." In the petitions, Gelfand noted that Sarah will "frequently elope[] from her group home, resulting in sexual exploitation, homelessness, lack of food and medications, and general loss of hygiene-related cares."

¶5      In support of the petitions, two reports were filed with the court—one by Dr. Kula, a psychologist, and one by Michelle Hernandez, a program coordinator for Life Navigators. Dr. Kula's report opined that Sarah's impairment was "severe," she has no insight, she is unable to engage in "legitimate reasoning," she experiences "memory impairments," and is a "vulnerable individual." Hernandez's report stated that Sarah requires 24/7 supervision, has limited social skills, and needs help with various activities of daily living, medication management, and other daily cares.

¶6      On February 24, 2022, a hearing took place on the petitions. At the start of the hearing, the parties stipulated to the admission into evidence of Dr. Kula's report. During Dr. Kula's testimony, the circuit court expressed concern regarding the passage of time since the examination, and adjourned the hearing so that Dr. Kula could re-examine Sarah.

¶7      The following day, Dr. Kula performed a psychological evaluation and updated his report. The updated report indicated that Sarah continued to demonstrate severe impairments with regard to her intellectual, cognitive, academic, and psycholinguistic skills and resources.

3

¶8      At the reconvened hearing on March 3, 2022, the parties stipulated to the admission of Dr. Kula's new report, and Dr. Kula was not called to testify. My Choice Wisconsin called Gelfand and Hernandez.

¶9      Gelfand testified that Sarah currently resides at an adult family home, which helps her with her daily living, makes sure she takes her medications, arranges medical appointments, and provides medical transportation and mental health services as needed.  Gelfand testified that Sarah's current placement is the "most safe and least-restrictive environment for her."  Sarah "absolutely loves living there," "has been thriving," and the staff provide guidance and care. Gelfand testified that even if a guardianship was not granted, all of the support and assistance that Sarah currently receives at the adult family home would be continued as long as she remained involved and enrolled in My Choice Wisconsin.

¶10      When asked why a petition for guardianship was filed since there was an HPOA, Gelfand testified that the agents were not available "to the degree needed[.]"  According to Gelfand, when Sarah would elope, oftentimes Gelfand could not reach the agents over the phone or they were busy with "great grandchildren and such."  Gelfand stated that the concern was that the agents were not assisting in getting Sarah back to her placement.  Gelfand further stated that: "You know, when we would suggest calling police or doing this and that, they are saying, you know, most of the time they would say, you know, do whatever you need to do, don't involve us."

¶11      Gelfand further testified that when she tries to call D.K., the primary agent, she is "not always" able to reach her and "sometimes" she does not return voicemails.  C.K., the alternative agent, responds "at times," but oftentimes she is busy with her grandchildren and has no time "to participate in discussion and

search." Gelfand testified that with a guardian in place, there would be "a system … that will allow for Sarah to live in a safe environment, for someone to be there for her at any given moment to help her with informed decision making, keep her safe, and [a] caregiver who would be able to address her health and safety risks, once again, on a daily basis." Gelfand nominated Easter Seals, a third-party corporate guardian, to serve as Sarah's guardian.

¶12 Next, Hernandez testified that Sarah's current placement was the least restrictive setting consistent with her needs. Hernandez testified that Sarah liked her current placement, and the services included assistance with laundry, cues for bathing, meal preparation, and medication. Hernandez stated that the staff were onsite 24/7 and monitor the residents' egress. Hernandez's report was received into evidence without objection.

¶13 Finally, Sarah testified on her own behalf. She testified that she did not want a guardian, and that she believed that she could make all of the necessary decisions with the help of her family. Sarah testified that she was committed to taking her medications and does not want to stop.

¶14 At the conclusion of the hearing, Guardian ad Litem Grete Engel provided her recommendation to the court. She indicated that Sarah was "in need of some help" and she had concerns about her HPOA agents that "they are not available and they are not responding to what her needs are[.]" She noted that she spoke with C.K., Sarah's alternate agent, on the phone and at a meeting. She also reached out to D.K., Sarah's primary agent, by telephone and letter, but did not get a response from her. In her last attempt to speak to D.K., her voicemail was full and she could not leave a message. This caused her concern that if D.K. could not

5

be contacted for a court hearing that she could not be relied on to provide decision-making support for Sarah when needed.

¶15 The circuit court granted the petition for guardianship and the petition for protective placement. The court found that Sarah was incompetent, and that the least restrictive placement was the adult family home that Sarah was currently residing in. Regarding the HPOA, the court stated, "I just think that, in this instance, while [D.K. and C.K.] care very much about [Sarah], the lack of communication, the lack of ability to connect, plus the fact that Ms. Gelfand has a desire to work with the corporate guardian Easter Seals to take some dramatic steps to improve [Sarah] and help [Sarah]," granting the petitions was appropriate.

¶16 Written orders for guardianship and protective placement were entered, which revoked Sarah's HPOA. This appeal follows.

**DISCUSSION**

¶17 An individual facing a guardianship and protective placement has a "huge liberty interest at stake" because "[p]rotective placements … are the only involuntary commitments under Wisconsin law that are indefinite in duration and thereby are tantamount to a life sentence to a nursing home or other custodial setting." *Walworth Cnty. v. Therese B.*, 2003 WI App 223, ¶12, 267 Wis. 2d 310, 671 N.W.2d 377 (citation omitted; brackets and ellipse in original). As the United States Supreme Court has stated with respect to involuntary commitments:

> The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital "can engender adverse social consequences to the individual" and that "[w]hether we label this phenomena 'stigma' or choose to call it something else ... we recognize that it can occur and that it can have a very significant impact on the individual."

*Vitek v. Jones*, 445 U.S. 480, 492 (1980) (citation omitted); *see also **State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.***, 122 Wis. 2d 65, 80, 362 N.W.2d 104 (1985).

¶18    To succeed on a petition for protective placement, the petitioner must establish by clear and convincing evidence that:  (1) the individual has "a primary need for residential care and custody;" (2) the individual "has been determined to be incompetent by a circuit court;" (3) "[a]s a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others," and (4) the disability "is permanent or likely to be permanent."  WIS. STAT. § 55.08(1) (2021-22).[3]

¶19    To succeed on a petition for guardianship, the petitioner is required to prove by clear and convincing evidence that "because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety."  WIS. STAT. § 54.10(3)(a)2.  The petitioner must also show that the "individual's need for assistance in decision making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, a supported decision-

---

[3] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

making agreement under ch. 52, or other means that the individual will accept." Sec. 54.10(3)(a)4.

¶20 A circuit court shall dismiss a petition for a guardianship if the court finds "[a]dvance planning by the ward … renders guardianship unnecessary." WIS. STAT. § 54.46(1)(a)2. This includes "any advance planning for financial and health care decision making that would avoid guardianship," such as a power of attorney for health care. WIS. STAT. §§ 54.10(3)(c)3., 54.46(1)(a)2.

¶21 On appeal, Sarah argues that a guardianship was not necessary because she had an activated HPOA, and her health care agents had not failed to perform their duties. Sarah contends that participating in a search when she eloped from her group home is not within the duties of a health care agent, and health care agents are not mandated to return telephone calls regarding matters unrelated to health care decisions. Thus, Sarah asserts that the guardianship petition should be dismissed along with the protective placement petition.

¶22 In its response brief, My Choice Wisconsin concedes that it was not within Sarah's HPOA agents' authority to participate in a search for her when she eloped, and that the agents were not required to return telephone calls to service providers regarding matters unrelated to health care decisions. My Choice Wisconsin, however, contends that a guardianship is necessary because the HPOA "only extend[s] to health care decisions," and Sarah's agents "were not reliably available to meet Sarah's needs."

¶23 We conclude that My Choice Wisconsin has failed to establish by clear and convincing evidence that a guardianship and protective placement were necessary and that Sarah's HPOA should be revoked.[4]

¶24 First, My Choice Wisconsin does not specifically identify, nor does the record establish, what non-health care support was needed outside of the services Sarah was already receiving at her current residence. According to the testimony at the hearing, Sarah's current adult family home provides onsite staff care 24/7 and monitors the residents' egress. Sarah also receives assistance with daily living skills, medication, medical appointments, and medical transportation and mental health services as needed. The testimony further established that these services were to continue regardless of the guardianship.

¶25 Second, as Sarah observes, there was no evidence presented at the hearing that the HPOA agents were unavailable to speak with Sarah's doctors, refused to allow her to obtain medical care, encouraged her to discontinue or refuse her medications, or undermined the services provided to Sarah by her adult family home. Rather, the testimony reflected that My Choice Wisconsin sought a guardianship and protective placement based on Sarah's elopements, and the fact that the HPOA agents did not help search for Sarah. My Choice Wisconsin,

---

[4] We note that the parties do not cite any binding case law specifically addressing the standard of review for a decision under WIS. STAT. § 54.46(1)(a)2. While the statutory language may be read to suggest whether a guardianship is unnecessary is a discretionary determination, at the same time, the analysis hinges on a question of statutory interpretation, which is a question of law that we decide *de novo*. *See* **Sauk Cnty. v. W.B.**, No. 2021AP322, unpublished slip op. (WI App Sept. 9, 2022); WIS. STAT. RULE 809.23(3) (stating that we may cite to unpublished cases for persuasive value). For the purposes of this opinion, we do not resolve this question as we conclude that My Choice Wisconsin does not prevail under either a discretionary or *de novo* standard of review.

however, did not present any evidence explaining how or why the appointment of a third-party corporate guardian would prevent Sarah from eloping.

¶26     In support of its argument, My Choice Wisconsin points to *Sauk Cnty. v. W.B.*, No. 2021AP322, unpublished slip op. (WI App Sept. 9, 2022), which rejected an argument that an HPOA rendered a guardianship for W.B. unnecessary.  In that case, a guardianship and protective placement was sought to prevent W.B. from moving out of a nursing home.  *Id.*, ¶4.  This court held that because the HPOA agent could not require W.B.'s continued placement in a nursing home, a guardianship and protective placement was necessary.  *Id.*, ¶27.

¶27     In contrast, here, a guardianship was not sought to keep Sarah at her current placement.  There is no indication that Sarah objected to her current placement.  Rather, the testimony reflected that Sarah "absolutely loves living there" and has been "thriving there."  Thus, we conclude that *W.B.* is inapposite, and does not support the necessity of a guardianship and protective placement under the particular facts of this case.

¶28     Therefore, based on the record before us, we conclude that the circuit court improperly granted a guardianship, and we reverse.  Additionally, because the protective placement order is dependent on the guardianship's now-vacated incompetency adjudication, we also reverse the protective placement order.  *See* WIS. STAT. § 55.08.  Upon remand, we direct the circuit court to dismiss the orders.

> *By the Court.*—Orders reversed and cause remanded with directions.

> This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.